Norman E. WYMBS and Ann R. Cassady, Plaintiffs-Appellees,

v.

REPUBLICAN STATE EXECUTIVE COMMITTEE OF FLORIDA, Defendant-Appellant.

No. 82–6066.

United States Court of Appeals, Eleventh Circuit.

Oct. 31, 1983.

Certiorari Denied March 19, 1984. See 104 S.Ct. 1600.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This appeal addresses the power of a federal district court (1) to reorder the manner in which the Florida Republican Party selects delegates to the Republican National Convention and (2) to control how the Party's State Executive Committee conducts its voting when carrying out functions required of it by Florida law. The district court struck down as violative of the equal protection clause of the fourteenth amendment the rule of the Florida Republican Party that governs the selection of delegates to the national convention. The court also ordered the State Executive Committee to refrain from conducting certain statutorily mandated functions until the Committee weighted its voting on a one Republican, one vote standard. We hold that article III of the Constitution does not permit a federal court to entertain the claims that were presented to the district court in this case. Accordingly, we reverse.

I.

Norman E. Wymbs, Ann R. Cassady, and Jack L. Moss (collectively referred to as "Wymbs") brought this suit, in two counts, in the United States District Court for the Northern District of Florida on January 31, 1980.[1] Wymbs and Cassady are registered Republicans and residents of Palm Beach County, Florida. Moss is a registered Republican and resident of Broward County, Florida. Wymbs named as sole defendant the Republican State Executive Committee of Florida (the Committee).[2] Wymbs al-

McFarland, Bobo, Sternstein, Wiley & Cassedy, Richard C. McFarlain, Tallahassee, Fla., William H. Allen, Harris Weinstein, Washington, D.C., Benton L. Becker, Miami, Fla., for defendant-appellant.

Roberts, Miller, Baggett, LaFace, Richard & Wiser, Barry Richard, Tallahassee, Fla., for plaintiffs-appellees.

1. Moss was not named as a plaintiff in the original complaint but was joined as a plaintiff later.

2. Wymbs' complaint did not allege that the State Executive Committee was an entity capable of being sued. The Florida statute outlining "Powers and duties of executive committees" does not speak to the matter. *See* Fla.Stat. Ann. § 103.121 (1982). The Committee answered Wymbs' complaint, however, without qualification, and therefore we do not pursue this issue.

leged in count one that the Committee performs a number of important political and governmental functions that amount to state action: (1) the adoption of presidential preference primary rules, as authorized by Fla.Stat.Ann. § 103.101; (2) the nomination of presidential electors, pursuant to Fla.Stat.Ann. § 103.021(1); (3) the filling of vacancies in nominations, as authorized by Fla.Stat.Ann. § 100.111; and (4) the collection of party assessments from candidates, as provided in Fla.Stat.Ann. § 99.092. Wymbs alleged that when the Committee carries out these four "governmental functions" it violates his fourteenth amendment right to equal protection of the law.[3] Wymbs maintained that Palm Beach and Broward County Republicans, who numbered 96,368 and 154,624, respectively, received the same representation (two seats) on the Committee as did Liberty and Dixie County Republicans, who counted as their number 21 and 29, respectively.[4] Wymbs sought to end this disparity.

Wymbs did not request the district court to reform the Committee's membership, but, instead, to enjoin the Committee from voting on the above four matters until it adopted a weighted, proportional voting system. Thus, when voting only on these four matters the weight of the Committee members' votes would vary depending upon the number of registered Republicans in their counties. Although the Committee has, for many years, been required by state statutes to conduct these four activities, and full relief in this case would therefore impinge upon these laws, neither the State nor the state officer responsible for enforcing these statutes was made a party to this suit.[5]

In count two of his complaint, Wymbs sought to overturn Rule 11(4)(b) of the *Republican Party of Florida Party Rules of Procedure* (Rev.1979), which required that three delegates and three alternates to the 1980 Republican National Convention be chosen from each congressional district in Florida irrespective of the number of registered Republicans in the district. As in count one, Wymbs alleged that this delegate selection rule denied Florida Republicans equal protection of the law.[6] Although rule 11(4)(b) was simply part of the state party's version of Republican National Party Rules 30 and 31, which were binding on every state Republican party in the nation, the Republican National Committee was not made a party to this suit. Because state rule 11 is based on national party rules which will govern the selection of delegates to the 1984 convention, Wymbs' count two claim is not moot.[7]

---

**3.** Wymbs also sought relief under 42 U.S.C. § 1983 (1976). His reference in the complaint to § 1983 consisted merely of a one sentence averment in each count. In count one he stated that the action "arises under the Fourteenth Amendment to the United States Constitution and U.S.C. Title 42, § 1983." Count two alleged that the defendant "violated U.S.C., Title 28 [sic], § 1983." The district court, in its memorandum opinions and dispositive injunctive orders, made only passing reference to § 1983 and did not analyze Wymbs' claims under that section. Nevertheless, we construe the court's action as having granted Wymbs relief on his § 1983 claim in each count of his complaint.

**4.** These figures are for December 1979, the month before this suit was filed.

**5.** Fla.Stat.Ann. § 86.091 requires that "[if a state] statute, charter, ordinance or franchise is alleged to be unconstitutional, the Attorney General or the state attorney of the judicial circuit in which the action is pending shall be served with a copy of the complaint and be entitled to be heard." *Id.* (1983 Supp.). Neither officer was served with process or accorded a hearing in this case.

**6.** *See supra* note 3.

**7.** Between quadrennial national conventions, the Republican National Committee is the embodiment and manager of the affairs of the Republican National Party. During the Republican National Convention, the convention itself is the Party. It conducts all of its own business, including the resolution of credentials disputes, and sets the rules and platform upon which the Republican National Committee will act until the next quadrennial convention. The rules of the Florida Republican Party for the selection of delegates from Florida to the 1984 Republican National Convention are based on the rules for the 1984 National Convention, as adopted by the 1980 National Convention. At the time this suit was brought the dispositive provisions of National Rules 30 and 31 were

On cross-motions for summary judgment the district court sustained Wymbs' attack on the selection of Republican National Convention delegates by congressional district. The district court agreed with Wymbs that even though the federal Constitution [8] commands that each congressional district contain nearly the same number of people, it is not equality of population but, instead, equality of party registration that counts in determining the constitutionality of the apportionment of a state's delegation to a national political party convention. The district court therefore held that each delegate district must contain an equal number of registered Republicans and, on July 1, 1980, enjoined the Committee from implementing rule 11(4)(b). The court stayed its injunctive order until after the 1980 Republican National Convention and the Committee immediately took an appeal to the former Fifth Circuit Court of Appeals.

The district court then disposed of count one of the complaint. The court sustained the constitutionality of the Committee's right to have two members from each county, each having an equal vote, and to conduct the business that Wymbs challenged. The court held that even if Committee conduct were subject to equal protection principles, the Committee's composition and the allocation of one vote to each member were not constitutionally deficient. The court therefore dismissed count one. Wymbs moved for a rehearing, and the court asked for further briefing on this constitutional question.

While the appeal on count two was pending in the Fifth Circuit,[9] the United States

Supreme Court held that the Democratic National Convention had a constitutional right to refuse to seat a delegation from Wisconsin that was elected under a state law at odds with party rules. *Democratic Party v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). The Fifth Circuit thereafter vacated the district court's injunctive order and remanded the case for reconsideration in light of *LaFollette.* *Wymbs v. Republican State Executive Committee,* 658 F.2d 324, 325 (5th Cir. Unit B 1981) (per curiam). The court considered *LaFollette* "of potential significance ... deserv[ing] careful scrutiny and argument," and observed that

> Although the factual context and issues presented in *LaFollette* do not precisely coincide with those here, the Court used broad language to the effect that "[a] political party's choice among the various ways of determining the makeup of a state's delegation to the party's national convention is protected by the Constitution."

*Wymbs,* 658 F.2d at 325, quoting *LaFollette,* 450 U.S. at 124, 101 S.Ct. at 1020. The court also questioned the justiciability of Wymbs' equal protection claim and drew the litigants' attention to the *LaFollette* footnote which referred to *Ripon Society, Inc. v. National Republican Party,* 525 F.2d 567 (D.C.Cir.1975) (en banc), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), where the Court of Appeals for the District of Columbia Circuit upheld Republican National Party Rule 30, upon which rule 11(4)(b), the delegate selection rule Wymbs challenged, was based. *Id.*

identical to their present form. Thus, Wymbs' count two attack on Florida state rule 11(4)(b) is not moot. State rule 11(4)(b) is the vehicle through which Florida Republicans hope to seat delegates at the 1984 convention. The Republican National Committee has the responsibility for enforcing these rules between conventions and for issuing the call to the 1984 convention that will prescribe formally how delegates are to be selected in conformity with those rules. The Republican National Committee appears as amicus curiae in this case for the purposes of this appeal.

8. *See, e.g., Hadley v. Junior College Dist.,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

9. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions of former Fifth Circuit handed down before October 1, 1981); *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982) (adopting as binding all decisions of Unit B of Former Fifth Circuit handed down after Sept. 30, 1981).

On remand, the district court, in a memorandum opinion, again held rule 11(4)(b) unconstitutional, observing that nothing in *LaFollette* or the Fifth Circuit's opinion remanding the case should cause it to change its previous decision. The district court concluded that Wymbs' equal protection attack on rule 11(4)(b) was not an attack on the first amendment rights of the national party or on that party's method of selecting delegates; rather, it was strictly an attempt to enforce the "one person, one vote" right which Wymbs claimed was guaranteed Florida Republicans under *Gray v. Sanders*,[10] 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

At the time the district court considered count two on remand, it reconsidered Wymbs' count one challenge that giving each county representative on the Committee one vote violated the equal protection clause. The court reversed its earlier ruling rejecting Wymbs' challenge, and found that two of the Committee's statutory functions—the promulgation of rules for the presidential preference primary and the filling of vacancies in nominations for statewide races—amounted to state action and, if performed when each county representative had one vote, would violate equal protection. The district court enjoined the Committee from performing these two functions until it implemented a voting procedure that ensured that each county representative on the Committee represented an equal number of Republican voters. In effect, the district court extended the "one person, one vote" principle of *Gray v. Sanders*[11] into a "one registered Republican, one vote" principle, applicable to purely intraparty rules and affairs.

We are now presented with final judgments on both counts of Wymbs' complaint.[12] On count one, the district court granted Wymbs partial relief; on count two relief in full. The court founded all relief on the equal protection clause of the fourteenth amendment.[13]

■ Before proceeding to the merits of the Committee's appeal, we need to stress that apportionment, voting rights, and political cases present difficult issues of justiciability, and of state action. Political squabbles are not as easily resolved in federal courts as are some other disputes. *See Baker v. Carr*, 369 U.S. 186, 281–85, 82 S.Ct. 691, 745–747, 7 L.Ed.2d 663 (1962) (Frankfurter, J., dissenting). An article III court is one of limited jurisdiction and may not pass on "abstract questions of political power, of sovereignty, of government," *Massachusetts v. Mellon*, 262 U.S. 447, 485, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1922); nor may it proceed in the face of a "lack of satisfactory criteria for a judicial determination." *Baker v. Carr*, 369 U.S. at 283, 82 S.Ct. at 746. "Judicial intervention in this area traditionally has been approached with great caution and restraint." *O'Brien v. Brown*, 409 U.S. 1, 4, 92 S.Ct. 2718, 2720, 34 L.Ed.2d 1 (1972). In order to proceed, a court must determine "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr*, 369 U.S. at 198, 82 S.Ct. at 700. This last attribute of justiciability is crucial; the final remedy ordered by an article III court must be one of finality, binding upon the parties.

Once Wymbs has crossed this threshold and shown his claim to be justiciable, he

---

**10.** The district court relied heavily upon *Gray*, a reapportionment case involving one-party rule in Georgia. See *infra* note 29. The court also gave heavy emphasis to *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), a pure reapportionment case, and *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), a case involving invidious racial discrimination.

**11.** 372 U.S. at 378–81, 83 S.Ct. at 807–9; *see also Hadley v. Junior College Dist.*, 397 U.S. at 52–53, 90 S.Ct. at 793 (1970) (citing cases).

**12.** Our jurisdiction to entertain this appeal is thus conferred by 28 U.S.C. § 1291 (1976).

**13.** The court also granted relief under 42 U.S.C. § 1983 (1976 & Supp. V 1981). *See supra* note 3. In this appeal we treat relief under § 1983 and the equal protection clause as one and the same. For reasons we set forth in the text *infra,* Wymbs has no claim under either provision.

must demonstrate that the Committee's conduct, as alleged, has amounted to, or would constitute, state action. This task is more difficult in political rights and apportionment cases in which the defendant is not the State or its express instrumentality. In the earlier fifteenth amendment cases, involving white-only primaries or other disenfranchisement of blacks, the courts freely found the conduct of political parties and groups to constitute state action.[14] But recently, courts have hesitated to find state action when, as in this case, racial discrimination is not involved. *See Cousins v. Wigoda,* 419 U.S. 477, 483, n. 4, 95 S.Ct. 541, 545, n. 4, 42 L.Ed.2d 595 (1975) (reserving the question); *O'Brien v. Brown,* 409 U.S. at 4 & n. 1, 92 S.Ct. at 2720 & n. 1 (1972) (not deciding and entertaining "grave doubts" as to actionability of the claim); *Ripon Society, Inc. v. National Republican Party,* 525 F.2d at 574–76 (reserving the question but deciding the merits for the defendants).

In addition to these problems of justiciability and state action, Wymbs must deal with the strong first amendment freedoms of speech and association possessed by political parties. In a case somewhat similar to this one, the Supreme Court held that the first amendment protected the delegate-selection rules of the National Democratic Party against a conflicting state law. *Democratic Party of United States v. Wisconsin ex rel. LaFollette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). *LaFollette* and cases like it [15] stand for the proposition that courts should not lightly disturb political parties' decisions of strategy. We now consider Wymbs' claims. For ease of analysis, we address count two first.

## II.

Wymbs filed this case on the eve of the 1980 Republican National Convention.

Florida was entitled to fifty-one delegates to that convention. Florida will be entitled to eighty-two delegates to the 1984 Republican National Convention. This increase is due to the success the Republican Party has enjoyed at the polls in Florida since the 1980 convention and the additional Congressional seats brought on by population growth.[16] This total consists of twenty-five delegates, selected by the Committee, who will be pledged to the winner of the 1984 statewide preference primary, and three delegates for each of Florida's nineteen congressional districts. These district delegates, and their alternates, must be registered Republican voters in the congressional district from which they are selected.

## A.

The practice of selecting delegates to Republican National Conventions from congressional districts is not new. The party most recently ratified this practice at its 1980 convention. *See* rules 30 & 31, *Rules Adopted by the 1980 Republican National Convention,* 13–16 (1980) (National Rules). Rule 11(4)(b), which Wymbs attacks, orders three delegates from each congressional district. It contains provisions substantively identical to those of the National Rules. Wymbs contends, however, that sending three delegates from each congressional district to the Republican National Convention is not required by the National Rules, but only by the state rules. The district court did not respond to Wymbs' contention. Our reading of the National Rules indicates that Wymbs is wrong; the National Rules do require that three delegates come from each congressional district.[17]

The preamble to the National Rules states that the rules govern how "delegates

---

**14.** *See Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944).

**15.** *See, e.g., Cousins; O'Brien; Ripon, supra.*

**16.** Rule 30(A), *Rules Adopted by the 1980 Republican National Convention* (1980).

**17.** Of course, Wymbs brought this suit before the 1980 National Rules were adopted; therefore, the 1976 rules were controlling. National Rule 30(A)(2), quoted *infra* text accompanying note 18, remains unchanged from 1976 to the present. It is this rule which lies at the heart of Wymbs' complaint in count two.

and alternate delegates shall be allotted to the respective states in the [1984] convention, and how their election shall be conducted and contests shall be considered." National Rules at 3. National Rule 30 states:

The membership of the [1984] national convention shall consist of:

A. Delegates

1. Six (6) delegates at large from each of the fifty (50) states.

2. Three (3) district delegates from the district of each Representative in the United States House of Representatives from each state.

In addition, Florida will receive nineteen bonus delegates, for a total of eighty-two.[18] Thus the Republican National Committee,[19] which is not a party to this lawsuit, and the National Rules, which are not at issue in this lawsuit, require three district delegates from *each* district. But Wymbs maintains that National Rule 30 merely provides an option which the state party has selected. A careful reading of the National Rules and the relevant Florida law belies this claim. National Rule 31(f) does state that "[a]ll delegates from any state may be chosen from the state at large, in the event that the laws of the state in which the election occurs, so provide." Florida law, however, does not so provide.[20] Moreover, an at-large, statewide selection under National Rule 31(f) would not change the National Rule 30 requirement that three delegates

come from *each* district. The contest for the congressional district delegate seats is simply moved from the district level to the state as a whole.[21] As the Republican National Committee stated in its amicus brief:

For some time Republican National Conventions have chosen to incorporate by reference certain relevant provisions of state law in their rules, but, in the absence of state law provisions, [and Florida has none], the rules require that the three congressional district delegates be selected by the voters (or voter representatives) of the districts and not in at-large statewide elections or conventions. In any event, the congressional district delegates must be residents of and qualified voters in the districts they represent.

Brief of amicus curiae Republican National Committee at 4.

### B.

Count two of the complaint challenges State Rule 11(4)(b) only, as an improper manner of selecting delegates. State Rule 11(4)(b) incorporates and is subordinate to the National Rules. Because compliance with the National Rules is required in order properly to choose and seat a Florida delegation at the 1984 Republican National Convention, a serious question is raised as to whether the Republican National Committee is a necessary or indispensable party to this case.

---

**18.** National Rule 30(A) goes on to grant other delegate seats to Florida, such as bonus delegates. We are concerned in this count only with the constitutionality of selecting three delegates from every U.S. congressional district in Florida regardless of the number of registered Republicans in the district.

**19.** *See supra* note 7.

**20.** Florida has not so provided at any time relevant to this appeal. In Florida, selection of delegates to the national nominating conventions of political parties is governed by Fla. Stat.Ann. § 103.101 (1982 & Supp.1983). The provisions touching most closely on this issue are those in § 103.101(8) which permit delegates to be allotted either on a winner-take-all or a proportional basis. This statute does not mandate any statewide election. In fact, this

law assumes delegate selection will occur at both the statewide and congressional district levels, as is now the practice.

**21.** In other words, the delegate selection process would occur on a statewide level, but three delegates would still have to come from each congressional district. If National Rule 31(f), which allows state-wide election of the three delegates residing in each congressional district, were applicable, there would be no constitutional issue at all in this case. The one person, one vote principle simply does not apply when the district serves as a unit of residence rather than a unit of voting. *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975) (per curiam). *See* J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 662 (1978). Unfortunately, such is not the case here.

Our analysis of this joinder problem[22] is guided by Fed.R.Civ.P. 19.[23] An inquiry under rule 19 is a two-part test. First we must ascertain whether, under the standards of rule 19(a), the person in question should be joined, if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction), then the court must inquire whether, applying the factors enumerated in rule 19(b), the litigation may continue. Rule 19(b) requires a court to determine how prejudicial a judgment would be to the nonjoined and joined parties, whether this prejudice could be lessened by the relief the court shapes, whether any judgment without joinder could be adequate, and, finally, whether the plaintiff would be left with any remedy should the court dismiss for nonjoinder. *Challenge Homes, Inc. v. Greater Naples Care Center,*

*Inc.,* 669 F.2d 667, 669 (11th Cir.1982). In making the joinder determination, a court should be guided by "pragmatic concerns, especially the effect on the parties and the litigation."[24] *Smith v. State Farm Fire & Casualty Co.,* 633 F.2d 401, 405 (5th Cir. 1980).

When the district court's decision on count two is examined in light of rule 19, serious flaws shine through. Rule 19(a) requires joinder of the Republican National Committee, if feasible, if in that committee's absence (1) relief cannot be accorded among those already parties or (2) that committee claims an interest relating to the subject matter of the action and is so situated that disposition of this suit may as a practical matter impair or impede its ability to protect that interest or leave a current party at risk of double or inconsistent obligations.

**22.** An appellate court may address joinder issues *sua sponte. Provident Tradesmen's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 106–08, 88 S.Ct. 733, 736–37, 19 L.Ed.2d 936 (1968); *GTE Sylvania, Inc. v. Consumer Prods. Safety Comm'n,* 598 F.2d 790, *aff'd on other grounds,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Haby v. Stanolind Oil & Gas,* 225 F.2d 723, 724 (5th Cir.1955).

**23.** Rule 19 states in part:

**(a) Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party....

**(b) Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment

rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

**24.** Whether an absent party would be bound by res judicata is not the test. A court may not proceed without considering the potential effect on nonparties simply because they are not "bound" in the technical sense. Instead, as Rule 19(a) expresses it, the court must consider the extent to which the judgment may "as a practical matter impair or impede his ability to protect" his interest in the subject matter.
*Provident Tradesmen's,* 390 U.S. at 110, 88 S.Ct. at 738.

The Republican National Committee did not seek to intervene in this lawsuit. In its amicus brief it did not contend that the district court's injunction, if enforced, would impair the Republican National Party's ability to seat Florida delegates at its national convention in accordance with its rules. Rather, it argued, rather persuasively, that the district court's injunction could have no such effect because federal courts possess highly limited powers to interfere in the delegate selection process of a national political party. For this reason, we do not discuss the provisions of Fed.R.Civ.P. 19(a)(2).

The first point in rule 19(a) is of particular interest. Proper relief cannot likely be accorded the current parties in this suit without the Republican National Committee's presence. Wymbs sought to end, as unconstitutional, the selection of three delegates from each congressional district. The district court struck down the state rule mandating such selection. Unfortunately, however, its decision will have little or no effect; Wymbs still may not get the relief he seeks because the Republican National Convention, not the state executive committee, determines which delegates are seated.[25] "[F]or nearly a century and a half the national political parties themselves have determined controversies regarding the seating of their delegations." *O'Brien,* 409 U.S. at 5, 92 S.Ct. at 2720 (1972). *See* further discussion, *infra. See also LaFollette,* 450 U.S. at 123–24, 101 S.Ct. at 1019–1020; *Cousins,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

The Republican National Committee, and the Republican National Convention, are free to continue enforcing National Rule 30, mandating three delegates per congressional district. Rule 11 of the *Republican Party of Florida Party Rules of Procedure* simply ensures that the delegates from Florida will be seated at the national convention. If the Florida party rules are at variance with the National Rules, the national convention may seat whomever it deems to have been selected in accordance with the National Rules. To be sure, the district court's injunction, if enforced, will cause the state party either to establish equally apportioned delegate districts on the basis of Republican registration, or to elect all delegates at large. But the court's injunction will have no effect on the National Convention. That body will seat only those delegates selected in accordance with its rules, and Florida will have none—save the six at large and the nineteen bonus delegates granted it under the National Rules. See *infra* at 1085.

█ Because the district court did not provide the plaintiffs effective relief, we would be correct, at this point, in furthering the rule 19 inquiry to determine the feasibility of joining the National Committee as a party defendant and also the need, or desirability, of remanding the case to the district court for this determination. Instead, we reverse count two because the joinder problem, the potential for serious infringement of the Republican Party's first amendment rights, and article III limitations on the district court's jurisdiction combine to make this controversy nonjusticiable. In so holding, we find no need to determine whether the Committee's implementation of Rule 11(4)(b) amounts to state action and denies registered Republicans in Florida equal protection of the law, as the district court held.

C.

The fact that we find count two nonjusticiable should not be surprising. The Supreme Court has admonished federal courts to exercise "great caution," before we "interject [ourselves] into the deliberative processes of a national convention . . . involving as they do, relationships of great delicacy that are essentially political in nature." *O'Brien,* 409 U.S. at 4, 92 S.Ct. at 2720. The *O'Brien* Court expressed "grave doubts" as to the justiciability of judicial interference in delegate selection, and stated,

> Judicial intervention in this area traditionally has been approached with great caution and restraint. It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra party disputes as to which delegates shall be seated. Thus, these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties. *Highly important questions are presented*

---

**25.** Elaborate intra-party procedures exist to settle delegate credentials disputes. The final decision rests with the Credentials Committee

after one or both of two inferior Republican Party tribunals decide the matter. *See* National Rule 35.

*concerning justiciability .... Vital rights of association guaranteed by the Constitution are also involved.*[26]

*Id.* at 4–5, 92 S.Ct. at 2720 (citations omitted) (emphasis added).

Shortly after the High Court decided *O'Brien,* Justice Rehnquist amplified that holding. The Republican State Central Committee of Arizona sought a stay from Justice Rehnquist in his capacity as Circuit Justice, requesting relief from a district court's injunction that enjoined as violative of equal protection the use of the delegate bonus plan mandated under National Rule 30. The district court had held the plan unconstitutional because it was not related to the state's electoral college vote, Republican votes previously cast, or some combination thereof. *Ripon Society, Inc., v. National Republican Party,* 343 F.Supp. 168 (D.D.C.1972). Like the district court below, the *Ripon* district court dealt with the justiciability issue cursorily. After a divided circuit panel denied a stay in an unpublished opinion, Justice Rehnquist granted a stay, citing the above passage from *O'Brien* and finding "the probability of error in the result below." *Republican State Central Committee of Arizona v. Ripon Society, Inc.,* 409 U.S. 1222, 93 S.Ct. 1475, 1477, 34 L.Ed.2d 717 (1972). In a subsequent case a nearly identical delegate selection rule was later upheld on the merits by the District of Columbia Circuit, en banc. *Ripon Society, Inc. v. National Republican Party,* 525 F.2d 567 (D.C.Cir.1975).

Besides the Supreme Court, and Justice Rehnquist in chambers, this circuit has added a warning concerning justiciability. We remanded this very case in light of *LaFollette* and noted the justiciability issues it raised. *Wymbs,* 658 F.2d at 325. The district court, however, in its dispositive memorandum opinion, failed to heed these admonitions concerning caution and justiciability. It acknowledged that "[v]oting rights cases often present difficult questions," but summarily concluded that "resolution of [these questions] can be judicially managed.... If a breach of voters' rights can be shown, questions of justiciability do not preclude this court from enforcing constitutional protections by granting declaratory and injunctive relief." To the contrary, article III inhibits a federal court from entertaining any complaint that sets forth a claim that cannot be determined under judicially manageable standards, or seeks relief that cannot be granted, or which, if granted, may seriously infringe the constitutional rights of others.

The district court did cite two cases from the District of Columbia Circuit, *Bode v. National Democratic Party,* 452 F.2d 1302 (D.C.Cir.1971), *cert. denied,* 404 U.S. 1019, 90 S.Ct. 684, 30 L.Ed.2d 668 (1972) and *Georgia v. National Democratic Party,* 447 F.2d 1271 (D.C.Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971), to support its conclusion that count two of Wymbs' complaint presented a justiciable controversy. These two cases held that challenges to delegate selection rules of the National Democratic Party were justiciable. 452 F.2d at 1305, 447 F.2d at 1276–77. *But see Irish v. Democratic-Farmer-Labor Party,* 399 F.2d 119, 121 (8th Cir.1968). Both cases, however, involved challenges to the national selection rules and, unlike the instant case, the national party itself was sued. Moreover, they were decided prior to the Supreme Court's decisions in *O'Brien, Cousins,* and *LaFollette.* Were the District of Columbia Circuit called upon to decide these cases today, the court might reach a different result. In *Ripon Society, Inc. v. National Republican Party,* decided after *O'Brien* and *Cousins* came down, the court, sitting en banc, declined to decide whether a challenge to national party delegate selection rules was justiciable, observing, in passing, that it had previously regarded the issue as settled. 525 F.2d at 577; *see id.* at 592–95 (Danaher, J., concurring) (dispute nonjusticiable); *id.* at 602–604 (Tamm, J.,

---

**26.** The Supreme Court in *O'Brien* reiterated, as we do here, that "[t]his is not a case in which claims are made that injury arises from invidious discrimination based on race in a primary contest within a single state." 409 U.S. at 4 n. 1, 92 S.Ct. at 2710 n. 1. The district court did not note this distinction.

concurring) (same); *id.* at 609–12 (Wilkey, J., concurring) (same).

### 1.

The Supreme Court in *Baker v. Carr* set forth two criteria that an article III court should apply in assessing the justiciability of a claim. The first criterion concerns policy making; it requires the court to stay its hand when faced with "the impossibility of deciding [the controversy] without an initial policy determination of a kind clearly for nonjudicial discretion." 369 U.S. at 217, 82 S.Ct. at 710. The second criterion concerns the practicability of a judicial resolution of the controversy; it forbids the court from entertaining the suit if "judicially discoverable and manageable standards for resolving" the controversy are absent. *Id.*

Applying the first *Baker v. Carr* criterion, we conclude that to provide the relief Wymbs has requested would require this court to engage in political party policy making beyond its role in society and beyond our ken as article III judges. No doubt exists that Wymbs has actively and successfully competed in Republican Party affairs. He does not allege that he has been blocked from access to party affairs or invidiously discriminated against by anyone,[27] and does not assert that the party is run undemocratically. As members of the State Executive Committee from Palm Beach and Broward Counties—strongly Republican areas—Wymbs, Cassady and Moss have a special vantage point from which to change the innermost workings of the state party. The Wymbs group, apparently having failed in its attempt to alter Florida's delegation to the Republican National Convention so that the areas of the State in which Republicans are more numerous receive greater representation, has turned to an outside source, the federal courts, for assistance. The Supreme Court, in the recent cases we have cited, has cautioned against such interference in the inner workings of political parties. The Eighth Circuit has issued the same caution; it declined an invitation similar to the one Wymbs has extended us in this case. In *Irish v. Democratic-Farmer-Labor Party,* 399 F.2d 119, 121 (8th Cir.1968), the court was asked to overturn a rule of a state political party which permitted national nominating convention delegates to be selected from malapportioned districts. The court, noting no actual or claimed invidious discrimination, refrained from interfering:

> [I]n cases of this kind there are substantial and almost insurmountable problems with respect to remedy which would arise were we to favor the position of the plaintiffs here. These relate to the nature of the relief to be granted, the ensuing necessity of close court supervision, and the realization that, in any event, any remedy we might attempt to fashion might well not effectuate numerical equality ultimately anyway.

*Id.* at 120. *See Lynch v. Torquato,* 343 F.2d 370, 373 (3d Cir.1965); *Ripon,* 525 F.2d at 592–95, (Danaher, J., concurring) (federal intervention into intra-Republican Party dispute non-justiciable), *id.* at 602–604 (Tamm, J., concurring) (same); *id.* at 609–13 (Wilkey, J., concurring) (same).

We think it plain that this court is an inappropriate body to decide how the Florida delegation to the Republican National Convention should be selected. The controversy Wymbs presents in count two of his complaint is a disagreement over a pure question of internal Republican Party policy.[28] The Supreme Court has held that "it

---

**27.** Wymbs alleges no invidious discrimination of any type. He does not allege that he has been denied access to party office, party votes, or party podiums. This fact alone distinguishes this case from *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), where the Supreme Court was quick to intervene in political affairs. *Accord, O'Brien,* 409 U.S. at 4, n. 1, 92 S.Ct. at 2710 n. 1; *Irish v. Democratic-Farmer-Labor Party,* 399 F.2d 119, 120 (8th Cir.1968).

**28.** In addition to promoting the party's ideology and nominating successful candidates, a party's goals may include "rallying of voters . . . not only in an appeal to party members but to independent voters and even to members of an opposition party," *Ripon,* 525 F.2d at 593; encouraging the participation of minorities, women and young people, *id.* at 583–84; and ac-

is not for the courts to mediate the merits of [such a] dispute.... [A] court may not constitutionally substitute its own judgment for that of the Party." *LaFollette,* 450 U.S. at 123–24, 101 S.Ct. at 1020 (1981).

The district court's conclusion that federal courts are competent to make the kind of policy decision Wymbs sought in count two resulted from its adamant reliance on the one person, one vote rule of *Gray v. Sanders.*[29] The one person, one vote rule requires, simply, equal representation of all people. Federal courts are well situated to apply this rule and to fashion an enforceable remedy. *See Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Avery v. Midland County,* 390 U.S. 474, 481, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506

(1964). The district court purported to follow this rule, but did not; instead, it created a new rule—one registered Republican, one vote. In taking this step, the district court actually decided whom the Republican Party must represent.[30] The Party, and its delegates in national convention, may only represent registered Republicans. The court justified its holding "because the Florida Statutes bind each delegate [to the Republican National Convention] to support the Republican candidate he or she was elected to support." This holding is a policy decision that federal courts are ill equipped to make and a decision not logically required by Florida law. The district court did not explain why a Florida Republican delegate, who is bound to a candidate in a limited way, could not represent persons other than registered Republicans.[31]

---

cording greater weight in party decision making to "professionals," *id.* at 585, or to geographic segments of the party's constituency whose performance suggests likely success or, conversely, a need for retrenchment.

**29.** The *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), holding was a response in part to the one-party rule prevalent then in Georgia. *See Ripon,* 525 F.2d at 589 n. 65. *Gray* was a challenge to a primary system in Georgia whereby voting was disproportionately weighted by counties. We deal in the instant case with a challenge only to a *party* selection rule for national convention delegates, not an express state statute mandating disproportionate primary voting in a state where the primary is tantamount to an election, as was the case in *Gray.* Justice Douglas' opinion for the majority was expressly limited to primary elections, and did not reach issues concerning party conventions or delegate selections. *Gray,* 372 U.S. at 378 n. 10, 83 S.Ct. 807 n. 10. Moreover, the *Gray* Court was not faced with first amendment issues. In the years since *Gray,* the Supreme Court has afforded broad protection to the speech and associational rights of political parties. *See O'Brien, Cousins, LaFollette, supra. See also Belluso v. Poythress,* 485 F.Supp. 904, 912 (N.D.Ga.1980) ("The plaintiffs' claims are weakened to the extent that the plaintiffs seek constitutional interference with internal party decisionmaking."); *Fahey v. Darigan,* 405 F.Supp. 1386, 1396–98 (D.R.I.1975) (statute affixing size of party committees is unconstitutional). *Gray* is further distinguishable because the Court explicitly ordered apportionment based strictly on population. 372 U.S. at 371, 378, 379, 83 S.Ct. at 803, 807, 808. In the instant case, the dis-

trict court equated party registration, not population, with equal representation.

**30.** Judges simply are not well-positioned to make these decisions of policy. The district court, for example, did not take into account the fact that delegates serve a number of important roles at quadrennial national conventions besides nominating the presidential ticket. Delegates also set the rules, platform, and direction of the national party for the next four years. Further, the district court failed to give adequate consideration to the claims of the Committee and amicus that as a minority party the Republican Party must appeal to and represent voters who are not registered Republicans. *See infra* notes 31, 39.

The District of Columbia Circuit stated in *Bode:*

It seems to us that the constituency represented at a national convention does not comprise solely "Democrats," so defined. To the extent that a voter, whether he be a registered Democrat or Republican, third party adherent or independent, is given alternate slates by the two major parties, he has a stake in the outcome of the nominating process of both parties. Accordingly, the constituency for a national convention comprises to a certain degree the entire electorate.

*Bode v. National Democratic Party,* 452 F.2d 1302, 1306–1307 (D.C.Cir.1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972).

**31.** Delegates, of course, perform many functions besides voting for a presidential nominee. *See supra* note 30. They are not bound to the candidate for whom they are selected if their

Wymbs contends that the equal protection clause requires that delegate seats be equally divided among only those who are able to fill them, registered Republicans. The Committee and amicus contend, of course, that the equal protection clause does not apply to delegate selection, and, further, that as a matter of strategy, if not survival, the Republican Party, as a minority party, must grant identical representation to all Florida congressional districts. They argue that even though Republican registration may be low, the party vote in most Florida congressional districts, at least in national elections, is often high. The Committee and amicus cite persuasive proof to this effect.[32] One United States Court of Appeals has already declined to define the constituency of a national political party. *Ripon,* 525 F.2d at 584–87 & n. 58. The district court should have exercised similar restraint.

Even if we thought a federal court could, consistent with article III, define the constituency of the Florida Republican Party and decide how that constituency could best be represented at the national convention, we would be constrained by the Party's countervailing first amendment rights of free speech and association. Political parties have strong and time honored rights of free speech and association. Political speech is accorded dutiful protection because it "is more than self-expression; it is the essence of self-government." Brennan, *The Supreme Court and the Meiklejohn In-*terpretation of the First Amendment, 79 Harvard L.Rev. 1, 18 (1965). A political party and its members also "enjoy a constitutionally protected right of political association .... Moreover, '[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.'" *Cousins,* 419 U.S. at 487, 95 S.Ct. at 547 (1975), quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957).

The district court passed over the first amendment in its heavy reliance upon *Gray v. Sanders,*[33] *supra.* The district court should have heeded the admonition of the Fifth Circuit, when it remanded count two of Wymbs' complaint for reconsideration, to look to *LaFollette* for guidance. *LaFollette* instructs that,

> [t]he freedom to associate for the "common advancement of political beliefs" necessarily presupposes the freedom to identify the people who constitute the association....
>
> \* \* \* \* \* \*
>
> [A] State, or a court, may not constitutionally substitute its own judgment for that of the Party. A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution.

450 U.S. at 122, 123–24, 101 S.Ct. at 1019–20 (citations omitted).

candidate receives less than 35% of the convention vote, if their candidate has not won nomination by the second ballot, or if the candidate releases his delegates. Fla.Stat.Ann. § 103.101(6) (1982). Even if the only thing the delegates do is select a presidential nominee, and even if they were bound irrevocably to the candidate for whom they were selected, we fail to see how this requires a one registered Republican, one vote rule. The district court did not explain its holding; it is simply a non sequitur.

**32.** The Republican Party is more of a minority party in Florida than it is in the nation as a whole. Only 31.6% of voters registered to a party in Florida declare themselves to be Republicans. The nationwide figure is 36.3%. 1981 Republican Almanac 639. This minority status notwithstanding, the Republican presidential candidate has carried Florida six out of the last eight times, in every presidential election since 1952 except 1964 and 1976. In 1980, Floridians elected Republican members of Congress from the fifth, sixth, tenth and twelfth congressional districts. In each of these districts, Democratic Party registration exceeded Republican. M. Barone & G. Vjifusa, The Almanac of American Politics 1982, 213–42. These figures indicate that the Republican Party in this state relies heavily on voters not registered Republican. The Party's "constituency," i.e., who it represents, may very well be broader than registered Party members. As we state in the text, federal courts are not particularly well suited to make this determination.

**33.** *See supra* note 29.

## 2.

The second justiciability criterion set forth in *Baker v. Carr* requires a federal court to stay its hand if there is a "lack of judicially discoverable and manageable standards to resolve the controversy presented." 369 U.S. at 217, 82 S.Ct. at 710. A court must have the ability to determine facts, bind parties, and fashion an effective remedy. This last requirement is of special importance. If the court cannot relieve the harm of which a plaintiff complains, the court should not take the case; in the absence of an effective remedy its decision can amount to nothing more than an advisory opinion. Article III courts must follow "the firm and unvarying practice of Constitutional Courts to render no judgments not binding and conclusive ...." *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113–14, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948); *see also Glidden Co. v. Zdanok,* 370 U.S. 530, 569, 82 S.Ct. 1459, 1482, 8 L.Ed.2d 671 (1962); *United States v. Jones,* 119 U.S. 477, 478, 7 S.Ct. 283, 30 L.Ed. 440 (1886); *Hayburn's Case,* 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792).

The district court's injunction is a classic example of an order that is not conclusive; for it provides no effective relief.[34] Notwithstanding the court's order to the contrary, the Republican National Party had the final say on what Florida delegates were seated at the 1980 convention, and the Party will have the final say, again, in 1984.

*Cousins, supra; LaFollette, supra.* Wymbs, in an effort to convince us that the district court's injunction does provide effective relief, disclaims any interest in whether delegates selected according to his favored scheme are actually seated at the convention. He represents that his sole concern—and therefore the court's—is with the delegate selection in this state. Wymbs, in his brief, concludes with emphasis that an injunctive order embracing his scheme "*can* be enforced." But such an order would be, at best, of trifling effect. Wymbs' real complaint—that Republican National Convention seats Florida delegates who are chosen unconstitutionally—would remain unrelieved. A judgment that neither creates relief nor binds the parties to the court's will is not a judgment that an article III court may render.

There is another reason why the district court could not give effect to Wymbs' delegate selection scheme. The court would find it difficult, if not impossible, to reapportion Florida's delegate districts so that each contained nearly the same number of registered Republicans.[35] In fact, neither Wymbs nor the district court has suggested how such a reapportionment could be done. Decennial population census figures would, of course, be irrelevant in realigning delegate districts to reflect one registered Republican, one vote. It is true that each Florida county maintains a current voter registration list by party; *see* Fla.Stat.Ann.

---

**34.** *See* the discussion of joinder, *supra* at 1079–1081. An all-purpose definition of justiciability has never been published because of the "notorious difficulty" of defining the concept. Marshall, *Justiciability,* in Oxford Essays in Jurisprudence: A Collaborative Work 265, 269 (A.G. Guest, ed., 1961), quoted in Barton, *Justiciability: A Theory of Judicial Problem Solving,* 24 B.C.L.Rev. 505, 506 (1983). *See also* J. Nowak, R. Rotunda & J. Young, Constitutional Law 54–57 (1978); L. Tribe, American Constitutional Law 53 (1978). Justice Frankfurter noted this difficulty when he wrote,

Justiciability is of course not a legal concept with fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures, including the appropriateness of issues for decision ... and the actual hardship to the litigants of denying them the relief sought.

*Poe v. Ullman,* 367 U.S. 497, 509–09, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1960). Because the district court in this case simply did not provide effective relief, our decision is not difficult or subtle, but is a matter of simple practicality.

**35.** We are mindful that the district court did not order delegate districts to be reapportioned. Rather, it merely struck down rule 11(4)(b) which provides that three delegates be selected per congressional district. The effect of the district court's holding, however, is to require selection of delegates from apportioned districts. The Florida Republican Party may not select delegates in a statewide at-large procedure under National Rule 31(f) because Florida law does not so provide. *See* discussion *supra* at 502, slip op. at 1078.

§§ 98.051; 98.081; 98.201 (1982 & 1983 Supp.); so the court could, in theory, realign the delegate districts at a given point in time. But it is far from clear that this would satisfy the one registered Republican, one vote standard. If realignment occurred while voters were registering, the realignment might be obsolete by the time the delegates were chosen. The only time voter registration figures are static is during the 30-day closure periods before primary and general elections. Fla.Stat.Ann. § 98.051.[36] Using these closure periods to apportion would mean that delegate candidates would not know against whom or in what district they would be running until thirty days before the election. The confusion and unmanageability inherent in such an apportionment scenario is obvious.[37]

To summarize our holding on count two, we decline to reach the state action and equal protection issues reached below, but, instead, reverse because the claim presented in count two is nonjusticiable. Wymbs attacked state rule 11(4)(b), which provides that three Republican National Convention delegates be chosen from each congressional district. That rule does not control what Florida delegates are admitted to the convention, however. The National Rules control this issue, but Wymbs failed to sue the Republican National Committee, thus denying the court the power to afford him effective relief. Besides this potentially fatal joinder problem, the strong first amendment associational freedoms possessed by political parties limited the district court's ability to tell the Republican Party how to conduct its internal affairs and whom it should represent. Finally, enforcement of a one Republican, one vote rule would pose insurmountable practical and legal problems for the district court.

### III.

The district court, in count one, enjoined the Committee from promulgating any rules for the conduct of the presidential preference primary or from placing anyone on a ballot for a statewide office until it changed its voting procedure so that each county representative on the Committee represented an equal number of registered Republicans. The court did so because it viewed these two Committee functions, if performed, as state action which would violate the equal protection clause. We do not pass on these issues. The district court, in adjudicating this arguably unripe count, granted only partial relief that did not cure the perceived unequal representation on the Committee, and may have made it worse. Wymbs asked for, and received, relief that the district court's own interpretation of equal protection forbids. For this reason, we reverse.

Our initial concern is whether Wymbs' count one claim is ripe. A controversy must be ripe, presently ready for corrective action to be taken. It must not be contingent upon future events, especially those which are unlikely. Sound reasons of policy are behind this requirement. *See* J. Nowak, R. Rotunda & J. Young, Constitutional Law 64–66 (1978). The most important of these is that until the controversy has become concrete and focused, a court cannot evaluate the practical merits or the position of each party, especially in matters of constitutional determination. *Id.* at 65.

■ The district court enjoined the Committee from promulgating rules for the

---

**36.** Population figures are not inherently dynamic. They change at a slow and steady rate. For reapportionment purposes, this change, no matter how dynamic, occurs once every 10 years. Party registration figures, however, are very fluid. Individual voters who have not voted within two years may be purged from the books. Fla.Stat.Ann. § 98.081 (1982). Moreover, voter registration drives can add tens of thousands of voters to party rolls within weeks. Therefore, apportionment on the basis of party registration would be required much more fre-

quently than reapportionment based on population.

**37.** Indeed, Wymbs was confused during the proceedings in the district court as to the difference between a one person, one vote standard and a one registered Republican, one vote standard. In his complaint he requested the latter while his prayer for relief requested the former. His motion for summary judgment then requested the latter.

presidential preference primary or from placing anyone in nomination—the only functions the court found to be state action—until the Committee realigned its voting procedure. Wymbs' equal protection challenge in this count is thus limited to an attack on these functions. The record, however, is devoid of any showing that the Committee has ever filled a vacancy for nomination to statewide office [38] or will ever fill such a vacancy. Likewise, nothing in the record indicated that the Committee was promulgating, or planned to promulgate, additional presidential preference primary rules. The relief accorded was a prospective injunction against a set of facts that was not shown to have occurred previously, was not occurring, and is most unlikely to occur in the future. For relief in the federal courts, a hypothetical threat is not enough. *United Public Workers v. Mitchell,* 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). Wymbs must show that he has sustained or is immediately in danger of sustaining some direct injury as a result of the Committee's conduct, and the injury must be both real and immediate, not conjectural. *City of Los Angeles v.*

*Lyons,* —— U.S. ——, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citing cases). But we need not ground our count one decision on ripeness. Instead, we ground our decision on a fundamental defect in the district court's dispositive order.

The court held that because the Committee's county representatives did not represent equal numbers of registered Republicans, they could not perform the state action functions of prescribing presidential primary rules and filling vacant nominations for statewide office without violating the equal protection clause. Thus, the district court enjoined the Committee from conducting these two activities until it apportioned itself on a one registered Republican, one vote standard.[39]

A one registered Republican, one vote standard is simply the one person, one vote standard of the apportionment cases extended one step further. The one person, one vote concept is limited primarily to cases involving legislatures or bodies performing legislative functions.[40] Wymbs argues that the Committee is a rulemaking legislative-type body.[41] Thus, the Commit-

**38.** The nomination must go vacant, most likely through death or serious illness, after September 15 of the election year. *See* Fla.Stat.Ann. § 100.111(3)(b) (1982).

**39.** We do not decide the issue, but serious doubt can be raised concerning the wisdom of a one registered Republican, one vote standard rather than a one person, one vote standard. This issue, discussed briefly in the text, *supra,* requires a district court to make decisions it is not well equipped to handle, such as whom the Republican Party represents. *See supra* notes 30 & 31. *See also, Gray v. Sanders, supra* note 29, (Supreme Court ordered Georgia primary districts apportioned on basis of population, not party registration). *See also supra* text accompanying note 36.

**40.** One person, one vote does not, for example, apply to the election of state judges, *Wells v. Edwards,* 347 F.Supp. 453 (M.D.La.1972), *aff'd mem.* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973); *Buchanan v. Rhodes,* 249 F.Supp. 860 (N.D.Ohio), *appeal dismissed,* 385 U.S. 3, 87 S.Ct. 33, 17 L.Ed.2d 3 (1966), or to "special purpose assemblies," *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 727, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). The standard also does not apparently apply to state constitutional conventions. *Driskell v.*

*Edwards,* 374 F.Supp. 1 (W.D.La.) *vacated on other grounds,* 419 U.S. 812, 95 S.Ct. 26, 42 L.Ed.2d 38; *Bates v. Edwards,* 294 So.2d 532, 534 (La.1974); *Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474 *cert. denied sub nom. Lindsay v. Kelley,* 395 U.S. 827, 89 S.Ct. 2130, 23 L.Ed.2d 738 (1969); *Livingston v. Ogilvie,* 43 Ill.2d 9, 250 N.E.2d 138 (1969).

**41.** This analogy to a legislature, which perforce must be a part of Wymbs' argument, is somewhat stretched at points. For example, the appointment of nominees for election vacancies resembles an executive, not a legislative, function. The Supreme Court has never held that one person, one vote is applicable to the selection of delegates to political party nominating conventions. *See Cousins,* 409 U.S. at 483 n. 4, 95 S.Ct. at 545 n. 4. Federal district courts are divided on this point. *See Ripon,* 525 F.2d at 579 n. 29 (citing cases). No U.S. Circuit Court has held the one person, one vote rule applicable to selection of delegates to national political conventions. Two circuit courts have rejected this contention. *See Ripon,* 525 F.2d 578–87 (D.C.Circuit) and *Irish,* 399 F.2d 119–25 (8th Cir.). Wymbs would not just have us become the first circuit to apply this rule to delegate selections. He would have us take one step further and apply a one registered Republican,

tee's "legislators" cannot vote on state action matters unless the Committee is "reapportioned" to accord registered Republicans equal representation. If one assumes that the Committee engages in state action and the fourteenth amendment requires a one-registered Republican, one vote rule, the district court's injunctive order would appear to have settled the issue squarely. The Committee, with the votes of each county committeeman and committeewoman duly weighted, would indeed equally represent registered Republican voters across the state. The one person, one vote analogy, as extended to registered Republicans, would be satisfied.

The district court and Wymbs, however, overlooked the Florida statute that dictates, in part, the membership of a state executive committee, Republican or Democrat.[42] Fla.Stat.Ann. § 103.091(6)(a) (1982 & 1983 Supp.). They assumed that the Committee consisted of 134 members, two per Florida county,[43] and the district court based its injunctive order [44] on this assumption. The statute, however, requires that a number of other persons sit on the Committee in addition to the two from each county. The statute states:

> Each political party of the state shall be represented by a state executive committee.
>
>     *     *     *     *     *     *
>
> Each state executive committee shall include, as at-large committeemen and committeewomen, all members of the United States Congress representing the State of Florida who are members of the

political party, all statewide elected officials who are members of the party, the President of the Senate, the Minority Leader in the Senate, the Speaker of the House of Representatives, the Minority Leader in the House of Representatives, and 20 members of the Legislature who are members of the political party. Ten of the legislators shall be appointed with the concurrence of the state chairman of the respective party, as follows: five to be appointed by the President of the Senate; five by the Minority Leader in the Senate; five by the Speaker of the House of Representatives; and five by the Minority Leader in the House. The governing body of each state executive committee as defined by party rule shall include as at-large committeemen and committeewomen all statewide elected officials who are members of such political party; up to four members of the United States Congress representing the State of Florida who are members of such political party and who shall be appointed by the state chairman on the basis of geographic representation; the permanent presiding officer selected by the members of each house of the Legislature who are members of such political party; and the minority leader selected by the members of each house of the Legislature who are members of such political party. *Each at-large committeeman or committeewoman shall be entitled to a single vote;* however, any such at-large committeemen and committeewomen holding anoth-

---

one vote standard. *See Bode,* 452 F.2d at 1305–1307, where the District of Columbia Circuit declined to enforce such a "rigid formula."

**42.** The Florida statute outlining the powers and functions of political parties' State Executive Committees, Fla.Stat.Ann. § 103.091 (1982 & Supp.1983), applies, of course, to both the Republican and Democratic Party. We do not hazard a guess as to what effect an affirmance of the district court would have upon the State Executive Committee of the Florida Democratic Party.

**43.** The rule that two persons from each Florida county—a committeeman and a committeewoman—sit on the Committee is a rule of the

Florida Republican Party. Fla.Stat.Ann. § 103.091(1) provides: "A political party may provide for the selection of its national committee and its state and county executive committees in such a manner as it deems proper."

**44.** The pertinent section of the district court's order states without elaboration, "Defendant Executive Committee is enjoined from promulgating any rules for the conduct of the Presidential Preference Primary or from filling any vacancy in nomination until it has implemented a voting procedure which equally represents registered Republican voters across the state."

er voting position on a committee shall be entitled to only one vote.

Fla.Stat.Ann. §§ 103.091(1) and (6)(a) (1982 & 1983 Supp.) (emphasis added). Although by party rule two persons represent each county on the Committee, the statute mandates that up to fifty-one [45] additional persons be seated on the Committee. Although the statute labels these additional members "at-large committeemen and committeewomen," only the statewide elected officials and United States Senators, a maximum possibility of ten, would be truly "at large" in the constitutional sense. The other members would be elected by, and thus represent, discrete districts. Given the operation of this statute and the two-per-county rule, the Committee, at the time this case was pending in the district court, had district representatives from four types of districts: counties, state representative districts, state senatorial districts, and United States House of Representative districts.

It is clear to us that what the district court did in this case, at Wymbs' invitation, of course, was to apply the equal protection clause only to a portion of the Committee, the 134 county representatives. If the one

registered Republican, one vote standard is the law,[46] the district court's injunctive order is unconstitutional and cannot stand. We conclude that the court dealt only with the county representatives on the Committee because they are the only Committee members mentioned in the court's dispositive instruments, in the record, and in the briefs on appeal. Nowhere is there any reference to the "at-large" Committee members created by section 103.091(6)(a).

We could not affirm the district court even if we assumed that Wymbs, in count one of his complaint, asked the court to realign the *entire* Committee, county representatives and the statutory "at-large" members alike, to conform to the one registered Republican, one vote standard, and that the court mandated such realignment. We reach this conclusion for two reasons.

### A.

First, the controlling Florida statute, section 103.091(6)(a), expressly provides that each "at-large" member it creates "shall be entitled to a single vote"; thus, the statute does not permit the Committee to weight the votes of these members.[47] In short, the

---

**45.** This figure includes up to 21 members of Congress, up to eight statewide officers, *see Fla. Const.* art. IV §§ 4–6, the two party leaders in the legislative houses, and 20 party members in the legislature. If Florida's eight statewide officers, two U.S. Senators, and 19 U.S. Representatives were all Republicans, these officeholders would become members of the Committee as would the 20 party members and two party leaders in the legislature: for a total of 51 additional Committee members.

**46.** Section 103.091(6)(a) orders a marked departure from the district court's and Wymbs' pristine concept that registered Republicans must equally (and only) represent registered Republicans on the Committee. The section places U.S. Representatives and Florida legislators on the Committee. Although these legislators must be registered Republicans, they are, in many instances, elected by constituencies consisting largely of registered Democrats. Unlike a Committee member chosen only by registered Republicans to represent his or her county, a Republican U.S. Congressman from a heavily Democratic area who is appointed to the Committee via § 103.091(6)(a) may act in the Committee (as well as in the U.S. House) in the interest of all voters in his district, especially the Democratic voters who control his politi-

cal future. The same holds true for the other Committee members appointed under § 103.-091(6)(a). The statute thus permits non-Republicans indirectly to elect members to the Committee because the only persons eligible for appointment to the Committee by that section are those chosen first by the general electorate. Accordingly, § 103.091(6)(a) corrodes the very heart of Wymbs' argument, that Committee members only represent, and should only be chosen by, registered Republicans.

Wymbs paid no mind to these statutorily designated Committee members. He sought only to have the Committee partially reapportioned by weighting the vote of county committeemen and committeewomen. Partial reapportionment of the county votes would still render Committee voting well out of line with the one registered Republican, one vote standard fashioned by the district court. Wymbs did not attack the statute; he asked for only half a loaf—a half loaf that the Constitution, as interpreted by the district court, forbids.

**47.** If the statute is followed literally, the Committee is powerless to weight any votes except for committeemen and committeewomen from counties. Additionally, if the Committee is

court was presented with an unambiguous statute, which Wymbs had not challenged, that was not open to construction; that is, a court would have to conclude that the Florida legislature intended that the votes of the "at-large" members not be weighted. To assume that the district court realigned the *entire* Committee membership to satisfy equal protection is, therefore, to say that the court legislated a new state executive committee scheme for political parties in Florida, a remedy article III plainly would foreclose.

### B.

Second, a district court order requiring the realignment of the entire Committee so that each member represented an equal number of registered Republicans cannot be enforced. To comply with such an order, the Committee would have to weight the votes of the following members according to the number of registered Republicans in their respective districts: the 134 committeemen and committeewomen representing counties, the party leader in the Florida Senate, the party leader in the Florida House of Representatives,[48] the twenty legislators appointed under § 103.091(6)(a), and all Republican U.S. Congressmen from Florida.[49] This would be an impossible task, one well beyond the ability of a federal district judge to supervise.

We can best illustrate the difficulty of this task by considering how one would weight the votes of a hypothetical Republican State Senator whom the Senate Minority Leader appointed to the Committee pursuant to section 103.091(6)(a). The Senator's vote on the Committee could not be weighed, of course, until the Minority Leader appointed him. Once appointed, his vote on the Committee would have to be weighted so that each of his Republican constituents and every registered Republican in the State received the same quantity of representation on the Committee. Assume that the Senator's district contained 10,000 registered Republicans and is conterminous with County A. Assume, further, no other statutory appointees to the Committee. Registered Republicans in County A would have three representatives on the Committee: the Senator, plus two committeepersons representing the county. The votes of these three could be weighted so that, in effect, there would be one Committee vote for each 3333 registered Republicans. Each of the three would cast one vote. County B, across the state, also has 10,000 regis-

---

eventually called on to exercise the two functions that the district court found were state action, the Committee may not refrain from exercising them because they are required by Florida law. These two functions are mandated by the State; the Committee has no discretion not to perform them. *See* Fla.Stat.Ann. §§ 100.111(3)(b) and 103.101(5). Thus, the Committee cannot comport itself with the district court's order simply by refraining from filling nomination vacancies and writing rules for the presidential primary. The district court's injunction, therefore, requires the Committee to violate § 103.091(6)(a) by weighting its members' votes, or to violate other provisions of Florida law by not performing the two functions at all.

Weighted voting would not be necessary if all members of the Committee were elected in a statewide at-large election in which only registered Republicans could participate. Practical concerns alone would render such an election not feasible. A 140–160 person committee cannot be elected on one statewide ballot. If the election of each Committee seat were contested, the ballot would contain at least 300 names and obviously would be unmanageable. Moreover, such an election scheme, restricted to registered Republicans, would conflict with the spirit of Fla.Stat.Ann. § 103.091(6)(a). This statute creates Committee seats that can only be filled by persons elected to Congress, to the state legislature, or to state-wide office in a general election.

48. The record in this case shows that the Republican Party is a minority party in Florida. As such, it usually holds a minority position in both houses of the state legislature and is led there by the Minority Leaders. We have employed the term Minority Leader in the hypothetical example which follows in the text.

49. *See Fla. Const.* art. III, § 16. State Senate districts are approximately three times the size of State House of Representative districts. The Florida Constitution requires the State to be apportioned into 30–40 equally populous senatorial districts and 80–120 equally populous representative districts. *Id.* In contrast, Florida now has 19 United States House of Representative districts.

tered Republicans but no State Senator or other statutory appointee representing it on the Committee. The committeeman and committeewoman from County B would thus possess committee votes with each, in effect, representing 5,000 registered Republicans. Each would cast one and one-half votes and registered Republicans in County A and County B would be equally represented.

The difficulties become insurmountable, however, when the election districts do not correspond to the counties. Suppose the Minority Leader appointed another State Senator to the Committee whose district encompassed all of County X, with 14,000 registered Republicans, about half of County Y, and a slice of County Z. No one would know exactly how many Republicans were registered in the half of County Y and the sliver of County Z that the new Senator represented. The Committee, in weighting its members' votes, would have to take a precinct by precinct count to determine exactly how many registered Republicans were in the Senator's district in both County Y and County Z. Once this was determined, the weighting could occur. The weighting would be rather simple for County X, but simply impossible for Counties Y and Z. About half of the Republicans in County Y, and a few Republicans in County Z would be represented by the Senator *and* the committeemen and committeewomen from their county. The remainder of registered Republicans in Counties Y and Z would be represented only by their county committeeman and committeewoman. But all Republicans must be equally represented. The committeemen and committeewomen from Counties Y and Z, therefore, would have to be given more votes when representing those Republicans in their counties who were not in the Senator's district, and fewer votes when representing those whom the Senator also represented. There would be no way to create such a variable weighting system, however; no matter how one might weight the Senator's

and the county committeepersons' votes, Republicans from those counties would be represented unequally. The only alternative might be some sort of unfathomable system by which the votes from the county representative would be somehow downweighted to account for the fact that the Senator represented only parts of the counties. A simple downweighting, of course, would cheat those Republicans living in the two counties outside of the senatorial district.

The foregoing is a very mild permutation on the difficulty that weighting the Committee votes would present.[50] When one considers more realistic examples, the weighting becomes even more onerous. Assume, for example, that the Minority Leader in the Florida House appointed a State Representative to the Committee whose district encompassed part of County X and part of County Y. How could his committee vote be weighted properly to take into account the representation already afforded by the State Senator from Counties X, Y and Z, above, or, say, the Republican U.S. Congressman whose seven and one-half county district included half of County X and all of Counties Y and Z? If a county were represented on the Committee by the committeeman and committeewoman from the county, a U.S. Representative, a State Senator, and a State Representative, the Committee votes of all of them would have to be drastically downweighted to avoid overrepresentation. Perhaps the committeeman and committeewoman could be given negative votes. Each individual Committee vote from every district—approximately 160 in all—would have to be apportioned simultaneously and in an equal ratio across the state.

Besides the murk presented by *how* the votes would be weighted, it remains totally unclear *when* weighting would have to occur. Apportionment based upon population is a simple decennial task. The district court, however, ordered the Committee to

**50.** For an even milder and much less complicated scenario involving the weighting of county committee votes from a single county in one

U.S. House of Representatives race, *see Montano v. Lefkowitz*, 575 F.2d 378 (2d Cir.1978).

reapportion its voting on the basis of party registration. Registration totals vary continually by county. *See* discussion *supra* at 1085–1086. In order to weight its votes properly, the Committee would need party registration figures for every county, State Senatorial district, State Representative district, and U.S. Congressional district. As seen in the above hypothetical, the weighting would also require precinct registration totals. Reweighting, at the very minimum, would have to be done every two years after Florida and U.S. Congressional elections resulted in changes on the Committee. More likely, however, the district court's standard could not be met unless the Committee were reweighted before every Committee vote. If the voting structure were weighted in January, the weighting would be obsolete by June—given the inevitable changes in registration rolls—and the one registered Republican, one vote standard would not be met.[51] The constant need for weighting these 160-odd Committee seats, which would require microscopic geometric exactitude and algebraic sleight of hand, would, to borrow from Justice Cardozo, plunge the district court into a Serbonian Bog.[52] *Landress v. Phoenix Mut. Life Ins. Co.,* 291 U.S. 491, 499, 54 S.Ct. 461, 473, 78 L.Ed. 934 (1934) (Cardozo, J., dissenting).

When we consider the practical impossibility of this task, the ripeness problem, and the fact that section 103.091(6)(a) in plain terms proscribes weighting in the first place, the only reasonable conclusion is that Wymbs' count one claim is non-justiciable. Workable realistic standards are, to put it mildly, absent.[53] *Baker v. Carr,* 369 U.S. at 217–18, 82 S.Ct. at 710. A federal court's ability to ensure and supervise fair and final relief based on one registered Republican, one vote is nil. *Id.* *See also, e.g., Chicago & Southern Air Lines, Inc. v.*

*Waterman S.S. Corp.,* 333 U.S. 103, 113–14, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948).

For the foregoing reasons, the district court's final judgments on both counts of the complaint are reversed. The district court, upon receipt of the mandate, shall dismiss the complaint.

REVERSED.

---

**51.** *See supra* note 36. Because population changes are recorded every 10 years, legislative reapportionment is normally a decennial task. Party registration totals are recorded almost continually, however, and apportionment on that basis would be a regular, almost constant, necessity.

**52.** "A gulf profound as that Serbonian Bog . . . where armies whole have sunk." J. Milton, Paradise Lost, book II l. 592.

**53.** *See* discussion *supra* at 1085.