This is an expedited appeal. The Alabama Republican Party appeals the order of the Montgomery Circuit Court issuing a writ of mandamus 1) ordering that Kelly McGinley's name be restored to the June 1, 2004, Alabama Republican Party primary ballot, and 2) directing the Alabama Republican Party and various state and local election officials to "count and certify any properly cast votes" for McGinley in that election. We reverse.
 I. Facts
The material facts do not appear to be in dispute. On April 2, 2004, Kelly McGinley filed a qualifying form with the Alabama Republican Party ("the Party") to qualify as a candidate for Place 1 on the State Board of Education. The form was properly filled out and timely submitted. Among other things, the form requires a potential candidate to certify as follows: "I am a Republican and am in accord with, and endorse, the principles and policies of the Republican Party."
On April 4, just before midnight, the members of the Party's steering committee — who also constitute the members of the Party's candidate committee[1] — received an e-mail from Clay Barclay, a member of the Mobile County Republican executive committee, raising certain objections to McGinley's qualifications to run for office as a Republican; specifically, the objections were to her loyalty to the Republican *Page 340 
Party. The e-mail indicated that several Republican constituents who live in State School Board District One (the district in which McGinley was attempting to run as a candidate) had complained about McGinley's candidacy and had indicated that they were concerned because, according to the constituents, McGinley was listed on various Web sites as being a member of the Constitution Party and because she had articles and links on her own Web site that were anti-President George W. Bush, anti-Republican, and pro-Constitution Party. The e-mail stated that the constituents had requested that the candidate committee consider this information when reviewing McGinley's qualifications to run for office as a Republican.
On the morning of April 5, the chairman of the Alabama Republican Party, Marty Connors, telephoned Jim Zeigler, an attorney who had filed McGinley's qualifying papers, and informed him that when the candidate committee met on April 7, it would consider a challenge to McGinley's qualifications. Connors testified that he informed Zeigler of the general complaints in the April 4 e-mail and that he informed Zeigler that he and McGinley could come to the meeting and would have the opportunity to testify. Later that evening, Zeigler telephoned McGinley and informed her that her candidacy was being challenged. McGinley testified that, at that time, she did not know why her candidacy was being challenged and that she discovered all of the bases for the challenge only after the publication of certain newspaper articles and during the court proceedings below.
On the morning of April 6, McGinley, Zeigler, Chris Brown, the Party's executive director, and Barclay appeared as guests on a Birmingham radio talk show. McGinley testified that during that show she stated that she had not seen the charges against her and that she had not been invited to the hearing. McGinley also testified that during the show Brown and Barclay alleged that McGinley's disqualification as a candidate was being considered because, he alleged, she did not support the "Party line," did not support President Bush, and was supporting the Constitution Party.[2]
That same day, shortly after the radio talk show had ended, Brown faxed a letter to McGinley and Zeigler; that letter stated:
"Dear Ms. McGinley,
 "Let this serve as a formal notification that the Alabama Republican Party will hold a Candidate Committee [meeting] to verify your qualification to run for School Board (Place 1) on the Republican Party ticket.
 "You will have the opportunity to speak on behalf of yourself at the Committee meeting being held at Alabama Republican Party Headquarters on April 7th at 6 p.m.
 "Chairman Marty Connors also gave verbal notice of the Committee meeting to your attorney, Jim Zeigler, on Monday, April 5th at 9:30 a.m.
"The address of ALGOP headquarters is as follows:
"3321 Lorna Road
"Suite 6
"Hoover, AL 35216
 "State law gives Political Parties a very short window of time to certify its candidates with the Secretary of State. This *Page 341 
alone is the reason for the speed in calling the Committee meeting.
"Enclosed is the agenda of the meeting."
The agenda indicated that McGinley's qualifications and the qualifications of two other candidates would be discussed at the meeting.
At 10:29 a.m. on April 7, Zeigler, identifying himself as "Attorney for Kelly McGinley," e-mailed to the members of the candidate committee McGinley's lengthy response, prepared by Zeigler, to the challenge to McGinley's qualifications. The e-mail indicated that McGinley had "twice been promised a copy of the allegations against her, but sadly they had not been furnished." The response detailed McGinley's history as a lifelong Republican and a continued supporter of Republican candidates, and stated that her admittedly strong critiques of, in her view, many liberal tendencies in the Party were based upon her status as an "outspoken `conservative Christian.'" Among other things, the response also addressed her admiration for, and certain of her articles concerning, the platform of the Constitution Party (but adamantly claims that she has neither joined that party nor quit the Republican Party), and claimed that she completely endorses the true Republican platform and wishes to see the Party "repent and come back to its platform." The response also contained a motion to dismiss the challenge to McGinley's candidacy based on, among other things, inadequate notice of the hearing and the failure of the Party to provide a copy of the allegations contained in the April 4 e-mail.
On the afternoon of April 7, Elizabeth Perry, executive assistant to Marty Connors, telephoned McGinley four times and Zeigler twice at Connors's direction in order to, in her words, "make sure we give her every opportunity to participate in the [hearing]." During these calls, Perry informed McGinley and Zeigler that if it was not possible for them to appear personally at the hearing, they could participate by telephone.
At 6:00 p.m. on April 7, the candidate committee met and considered the challenge to McGinley's candidacy along with the challenges to two other candidates. After discussing the issues referenced in the April 4 e-mail and Zeigler's response, the committee voted unanimously, by a vote of 20-0, to disqualify McGinley so that her name would not appear on the primary ballot. Later that evening, McGinley was notified of her disqualification. The next day, the Party filed an amendment to its earlier certification with the secretary of state, removing McGinley's name from the ballot.
On April 19, three days before the deadline for delivering absentee ballots and other materials to the absentee-election managers, McGinley filed this lawsuit challenging her disqualification. Following two hearings, the Montgomery Circuit Court held that in disqualifying McGinley the Party had violated McGinley's constitutional right to substantive due process under the Fourteenth Amendment to the United States Constitution, because it found that the Party had failed to demonstrate a "clearly articulated [P]arty rule" that McGinley had violated that would result in her disqualification and that it thereby had acted in an arbitrary manner:
 "There is no doubt that McGinley has strong criticisms of the Republican Party, but the Court has been presented with no clearly articulated [P]arty rule violated by such criticisms. Without a clear standard by which a candidate's allegedly disloyal conduct can be measured, the candidate cannot reasonably know what conduct is prohibited, and the Party cannot determine an alleged *Page 342 
violation of its qualifying oath in a fair and evenhanded fashion.
 "If a party is constitutionally bound to follow its own standards, as in [Gartrell v. Knight, 546 F.Supp. 449 (N.D.Ala. 1982)], it follows that a lack of any clear standards in this case by which to judge the candidate's eligibility would, by its own nature, be constitutionally insufficient. To hold otherwise would allow decisions to be made in an arbitrary manner. Accordingly, because the Party has no clear articulated standard capable of being applied in an objective manner, the Court holds that the actions of the Alabama Republican Party violate due process."
The circuit court ordered that McGinley's name be restored to the June 1, 2004, Party primary ballot and that the Party and the election officials count and certify votes cast for McGinley in that election. The Party appealed.
 II. Standard of Review
"[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust." Philpot v. State,843 So.2d 122, 125 (Ala. 2002). "However, where the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the court's judgment carries no presumption of correctness." Allstate Ins.Co. v. Skelton, 675 So.2d 377, 379 (Ala. 1996). Questions of law are reviewed de novo. BT Sec. Corp. v. W.R. Huff Asset Mgmt.Co., 891 So.2d 310 (Ala. 2004).
 "`Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.'"
Ex parte Perfection Siding, Inc., 882 So.2d 307, 309-10 (Ala. 2003) (quoting Ex parte Integon Corp., 672 So.2d 497, 499 (Ala. 1995)).
 III. Analysis
McGinley contends that the Party's actions violated both her procedural and her substantive due-process rights under theFourteenth Amendment to the United States Constitution. She claims that her procedural due-process rights were violated because she was not presented before the hearing with a copy of the "complaint" against her (i.e., the April 4 e-mail to the members of the candidate committee); she claims that her substantive due-process rights were violated because the Party had no "clearly articulated rule" delineated in advance, warning that her activities could disqualify her from running for office as a Republican. As an initial matter, we note that while the trial court indicated that the failure of the Party to provide McGinley a copy of the complaint was a "problem," its ruling was based solely on what it found to be a violation of McGinley's substantive due-process rights. Additionally, while we address the procedural due-process argument below, it is clear from the record that it was the substantive claim McGinley primarily advanced and relied upon in the trial court. See Taylor v.Stevenson, 820 So.2d 810, 814 (Ala. 2001) (this Court can "affirm a trial court if it is right for any reason supported by the record").
 A. Procedural Due Process
The Fourteenth Amendment guarantees a person the right to due process before a state actor[3] can deprive the person *Page 343 
of "life, liberty, or property." U.S. Const. amend. XIV. For purposes of this appeal, the Party assumes, without admitting, that McGinley has a "liberty interest" in running as a Republican candidate in the Republican primary election sufficient to invoke the procedural or the substantive protections of the Due Process Clause, see Board of Regents v. Roth, 408 U.S. 564,92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); this Court shall make the same assumption without deciding the matter. Even so, we hold that McGinley's procedural due-process claim is without merit.
It is undisputed that both McGinley and Zeigler had advance notice through oral and written communications 1) that McGinley's qualifications to run in the Republican primary election had been challenged; 2) that a hearing would be held before the candidate committee on April 7 at 6:00 p.m. to address the challenge to her candidacy; and 3) that they had the right to participate in that hearing, either in person or by telephone, and to present evidence in support of McGinley's qualifications. Even if the Party was in error in not giving McGinley a copy of the "complaint," i.e., the April 4 e-mail, that error, for two reasons, was harmless. First, McGinley's response specifically addressed virtually every point of contention raised in the e-mailed complaint. Second, McGinley decided not to attend the hearing, either in person, by telephone, or through her counsel; therefore, she cannot now contend that she was harmed by not being prepared to address the specific charges made against her in the complaint.
Additionally, the evidence presented before the trial court indicates that McGinley and/or Zeigler were to a substantial degree aware of the nature of the complaint. As described above, Marty Connors testified that he discussed with Zeigler the charges that had been made against McGinley; there was no rebuttal to this evidence.[4] Additionally, the general reasons for the challenge to McGinley's candidacy were discussed with McGinley and Zeigler during their appearance with Brown and Barclay on the Birmingham radio talk show. Perhaps most tellingly, the specificity with which McGinley's response addressed the allegations in the April 4 e-mail — even addressing the specific article (one of many articles on McGinley's Web site) that was the focus of the allegations against her — indicates that McGinley and Zeigler had sufficient knowledge of the allegations against McGinley. *Page 344 
The hallmarks of procedural due process are notice and "the opportunity to be heard `at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893,47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545,552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). Based on the above, we hold that McGinley had sufficient notice of the hearing and of the allegations against her (and that, in any case, she was not harmed by not having a copy of the "complaint"), and a sufficient opportunity to respond; there was no violation of her procedural due-process rights.
 B. Substantive Due Process
McGinley argues, and the trial court held, that her due-process rights were violated because, she argued, there was no "clearly articulated rule" that would warn her that her activities could disqualify her from running as a candidate in the Republican primary election. However, there is a rule that is at the center of this case: candidates for the Republican primary election must certify the loyalty statement on the qualifying form and their actions must conform to that statement. As stated above, the prerequisite certification is: "I am a Republican and am in accord with, and endorse, the principles and policies of the Republican Party." It is then for the Party's candidate committee to determine, by majority vote, whether someone actually holds beliefs and acts in a manner in accordance with that statement;[5] that was the process actually used in this case, as provided under the Party's rules. McGinley's actual argument, then, is that the Party's placing in the candidate committee the power to interpret what it means to believe and act in accordance with the loyalty statement is arbitrary and substantively unfair. This is a substantive due-process claim.
"Substantive due process" analysis forces courts to step beyond merely assuring, regardless of the outcome, that a state actor fairly followed a particular procedure (procedural due process) and to examine whether the particular outcome was itself "fair" or whether it was impermissibly "arbitrary or conscience shocking." Waddell v. Hendry County Sheriff's Office,329 F.3d 1300, 1305 (11th Cir. 2003) ("conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense"); see C.B. v. Bobo, 659 So.2d 98,103 (Ala. 1995) (stating that the "substantive component of the Due Process Clause `protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them"'") (quoting Doe v. Taylor Indep. SchoolDist., 15 F.3d 443, 450-52 (5th Cir. 1994), quoting in turnCollins v. City of Harker Heights, 503 U.S. 115, 125,112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). By nature, such an analysis (i.e., a judicial second-guessing of the decision of an entity possessing greater knowledge of the policies and considerations involved) is always taken with caution. See D.C. Fed'n of CivicAss'ns, Inc. v. Volpe, 434 F.2d 436, 440 n. 9 (D.C. Cir. 1970) (discussing, in the context of review of economic regulation, the danger of judicial second-guessing "inherent in the concept of `substantive due process'"); Santiago de Castro v. MoralesMedina, 943 F.2d 129, 130 (1st Cir. 1991) ("The history of the substantive due process doctrine indicates that it is to be applied with `caution and restraint.'"); see *Page 345 
generally Thomas Sowell, The Quest for Cosmic Justice (Free Press 1999) (discussing the dangers inherent in the concept of substantive, as opposed to procedural, due process).
The focus of our analysis here is the ability of the Party to place the power (as described above) in the candidate committee to interpret McGinley's statement on the loyalty oath and then to disqualify McGinley in light of the fact that the Party has no specific, detailed rules that list the ways one might fail to be in conformity with the loyalty statement and thereby might be disqualified as a candidate. To be successful, McGinley must produce evidence indicating that this system and its resultant deprivation was "for an improper motive and by means that were pretextual, arbitrary and capricious, and . . . without any rational basis."[6] Hearn v. City of Gainesville,688 F.2d 1328, 1332 (11th Cir. 1982); see C.B., 659 So.2d at 103 ("`the infliction of "corporal punishment in public schools `is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.'"'" (quoting with approval Doe v. Taylor Indep. School Dist., 15 F.3d at 450-52 (quoting in turn Fee v. Herndon, 900 F.2d 804, 808 (5th Cir. 1990)))); see also Village of Euclid v. Ambler Realty Co.,272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (holding that an ordinance violates the prohibition in the Due Process Clause on "arbitrary" government action only if it lacks a "substantial relation to the public health, safety, morals, or general welfare"). McGinley has not made such a showing, and her substantive due-process claim must fail because 1) it is undisputed that there is no explicit statutory or constitutional requirement that the Party list detailed rules governing the possible disqualification of candidates to test whether the candidates are "in accord with, and endorse, the principles and policies of the Republican Party," and 2) there is no evidence indicating that the candidate committee system used by the Party or the decision reached by that committee in this case is "arbitrary," "pretextual," "conscience-shocking" or without any rational connection to the Party's objectives and statutory discretion.
The following principle is well-established in Alabama:
 "The State Executive Committee of a [political] party has full right, power and authority to fix and prescribe the political and other qualifications of its own members and to determine who shall be entitled and qualified to . . . be candidates [in primary elections]. . . ."
Ray v. Garner, 257 Ala. 168, 171, 57 So.2d 824, 825-26 (1952). With regard to political primaries, this principle is codified in Ala. Code 1975, § 17-16-14(a), which provides:
 "All persons who are qualified electors under the general laws of the State of Alabama and who are also members of a political party and entitled to participate in such primary election under the rules of said party shall be entitled to vote therein and shall receive the official primary ballot of that political party, and no other; but every governing body of a party shall have the right, power and authority to fix and prescribe the political *Page 346 or other qualifications of its own members and shall, in its own way, declare and determine who shall be entitled and qualified to vote in such primary election or to be candidates therein or to otherwise participate in such political parties and primaries. The qualifications of electors entitled to vote in such primary election shall not necessarily be the same as the qualifications for electors entitled to become candidates therein. Nothing herein contained shall be so construed as to prohibit any state executive committee of a party from fixing such qualifications as it may deem necessary for persons desiring to become candidates for nomination to offices at a primary election."
(Emphasis added.) See also Ala. Code 1975, § 17-16-12 ("The name of no candidate shall be printed upon any official ballot used at any primary election unless such person is legally qualified to hold the office for which he is a candidate . . . and unless he . . . possesses the political qualifications prescribed by the governing body of his political party."). Clearly, this language recognizes the very broad discretion a political party has to, "in its own way," determine who is qualified to be a candidate. The only caveat to a state executive committee's otherwise plenary power to make such a determination is that, in doing so, the committee cannot "run afoul of some statutory or constitutional provision." Ray, 257 Ala. at 171,57 So.2d at 826.
McGinley's argument is that the candidate committee system, with very broad discretion given to the candidate committee, runs afoul of her substantive due-process rights; we cannot agree, however. As described above, our review of this claim is very limited; we look only to whether this system, and the decision it produced, is arbitrary, capricious, pretexual, "conscience-shocking" or wholly unrelated to the legitimate political interests of the Party. The ultimate question is: who is the final arbiter of whether a potential candidate truly is, in the words of the Party's qualifying form, "in accord with, and endorse[s], the principles and policies of the Republican Party"? For good or for ill, the answer must be the Party itself, not the courts and not every individual who desires to run for election as a Republican. Furthermore, there is no statutory or constitutional requirement that a political party list specific ways a potential candidate might be disqualified on the basis of not being "in accord with" that party so that if a contingency is not listed, it cannot be considered in a review of the candidate's qualifications. Therefore, in light of the broad statutory discretion given political parties,[7] when, as here, a political party *Page 347 
establishes a procedure by which members of its governing body — those who should have the most experience and knowledge as to what it means to "endorse" and to be "in accord with" that party — deliberate and decide the matter, we cannot and do not hold that such a procedure is arbitrary, capricious, pretextual, "conscience-shocking" or wholly unrelated to the party's legitimate political interests.
Additionally, we cannot and do not hold that the actual decision made by the candidate committee here is arbitrary, capricious, pretexual, "conscience-shocking" or wholly unrelated to the Party's legitimate political interests. The committee had before it the following evidence:
1) A copy of McGinley's resignation from the Mobile County Republican executive committee, which stated:
 "It is with extreme regret that I turn in my resignation to the [Mobile County Republican Executive Committee]. There are a lot of reasons, but the main *Page 348 reason is that there is no difference between a Democrat and a Republican except the rhetoric. For Christians this is no longer our home. I knew that the national party was too far gone, but I still had hope for our state and local party. After this last election, plus the last two meetings, the hope I had is now gone. I am a fighter, and do not give up, I just believe this is a sinking ship and my efforts can be better used elsewhere. If there are any questions please feel free to contact me. And believe me I will continue standing for truth."
(emphasis added at the time the resignation was introduced as evidence);
2) An article drafted by McGinley entitled "Why Christians Should Not Vote for George Bush";
3) An article drafted by McGinley entitled "Righteousness or Republicanism," and appearing on her Web site at the time the committee met to consider the challenge to her candidacy. The article stated, in pertinent part:
 "This country is in a constitutional and moral crisis and the blind loyalty to the Republican Party has a lot to do with the problem. We have got to stop supporting a candidate just because he or she has an `R' before his or her name. The Republican platform is great, but if the Republicans only give it lip service, what good is it? Truth is the Christians who blindly support Republicanism over righteousness have blood all over their hands.
". . . .
 "We must put the blame at the feet of Christians for the crisis we find ourselves in today. The Republican Party is not going save America. And our blind loyalty to it is destroying us. The party has been infiltrated with baby killers, sodomites, fornicators, promoters, big government socialism, big spending money grubbers, anti-gun Marxists just to name a few. This blind loyalty has given the politician a blank check to do whatever he wants. He knows that no one will know or really care because it is all about winning.
 "To most Christians the elections are just about winning, not truth and righteousness. They have no idea how the candidate stands on the issues. Some are naive enough to think that because they are Republicans that they stand on the Republican platform. There is hardly a Republican out there that will write legislation to end the genocide of Americans let alone to monitor the industry. Most every Republican I have interviewed believes in civil unions with benefits using your money. Not a one I know has tried to impeach a tyrannical judge let alone rein in his jurisdiction, as stated in Article III section 2 of the U.S. Constitution. Matter of fact you can hardly tell the difference between a Democrat or a Republican. . . .
". . . .
 "It is well past time to be loyal to Christ instead of the Republican Party. Time to stand for righteousness. It is time for a third party; the Constitution Party is the one I have in mind. Visit their website at www.constitutionparty.com. Check out their party platform and their candidates and you will see a big difference. Maybe if we practice tough love the Republican Party would repent and come back to its platform. But if not, duty is duty. Let righteousness ring!"
(some emphasis added; some added at the time the article was introduced as evidence);
4) Evidence that McGinley's Web site provided links to various Web sites the *Page 349 
sentiments of which were anti-President Bush;
5) A New York Constitution Party Web site listing McGinley as a member; and
6) A response submitted on her behalf by her attorney in which she did not repudiate any of her previous statements although she denied that she has either quit or called on others to quit the Republican Party.
Connors summarized the committee's determination as follows:
 "Q. And based on the evidence before the committee, what was the determination?
 "A. [Connors:] Well, the determination is, again, as a minimum threshold under the discretion that [Ala. Code 1975, §] 17-16-12 gives us, a party has to have the institutional ability to be able to say that if you're going to run as a member or as a candidate for our party you, at a minimum, cannot be endorsing the principles and/or other parties. I mean, it's just — that's the minimum threshold.
 "Q. All right, sir. And at this meeting, you determined that Ms. McGinley should be disqualified to run in the Republican primary; is that correct?
 "A. By a vote of — a unanimous vote of 20 to nothing."
McGinley contends that her actions are not in contravention of the Republican platform; rather, she says, they are in furtherance of the true Republican platform and were done to try to bring the Party back to its actual platform. However, it should be obvious that involvement in this issue — what is a political party's actual platform and who decides what it is — is something that courts must avoid. See Democratic Party of theUnited States v. Wisconsin ex rel. LaFollette, 450 U.S. 107,101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (holding that "[t]he freedom to associate for the `common advancement of political beliefs' necessarily presupposes the freedom to identify the people who constitute the association"). The inherently subjective judgment of the candidate committee as to the sincerity of a candidate's pledge, based on the facts in this record, falls well within the constitutionally permissible limits of the authority of a political party asserting its right to determine who may be associated with the party. No court should second-guess such a determination.
We do not here have a sanction imposed based entirely on a candidate's activities so remote in time as to suggest arbitrary and capricious conduct on the part of those imposing the sanction. For example, suppose the rejected candidate was Ronald Reagan seeking the Republican nomination for president in 1982 and the basis for refusal to accept his pledge of present party loyalty at face value was grounded entirely upon his activities as a Democrat several decades earlier. Whether such action would be constitutionally impermissible is a question we do not have to decide in this proceeding because all of the activities calling into question the sincerity of McGinley's pledge occurred over a period of only several months, beginning just over a year before her signing the pledge.
Nor do we have a sanction based solely on conduct that can only be described as critical of a fellow Republican and not critical of the Party itself, thereby suggesting arbitrary and capricious conduct. Whether such action would be constitutionally impermissible is another question we do not have to decide in this proceeding because McGinley's comments plainly and unambiguously crossed the line between criticism of an individual and criticism of the party as a whole. She endorsed the *Page 350 
Constitution Party and urged Republicans to exhibit "tough love" toward their party. Viewing her espousal of a policy of "tough love"[8] as advocating rejection of the Republican Party is certainly a reasonable construction of her language. As previously noted, McGinley never repudiated her former statements in her statement submitted on her behalf by her attorney in response to the challenge.[9] The candidate committee could therefore reasonably refuse to accept as true her statement, submitted by her attorney, denying that she had called on others to quit the Party.
In this respect, it is crucial to point out that we do not judge the wisdom of the candidate committee system of the Party, nor do we judge the wisdom of the decision to disqualify McGinley. It is not the judiciary's place to determine whether it is McGinley or the members of the candidate committee whoactually know what it means to be in accordance with the "true" platform of the Republican Party. The question is not whether the candidate committee was right in deciding as it did, the question is whether its decision-making is arbitrary, capricious, pretexual, "conscience-shocking" or wholly unrelated to the Party's legitimate political interests. Under the circumstances presented here, we must answer that question in the negative. In sum, the Party, through the candidate committee, has the legal discretion, authority, and power to make a wise or an unwise decision or a right or a wrong decision.[10] *Page 351 
 IV. Conclusion
Based on the above, McGinley had no "clear legal right" to the writ of mandamus, see Ex parte Perfection Siding, Inc., supra, and the trial court therefore erred in issuing the writ. The judgment of the trial court is reversed.
REVERSED.
SEE, LYONS, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
BROWN and STUART, JJ., recuse themselves.
[1] A resolution passed by the Party's executive committee governing the 2004 elections provides, in pertinent part:
 "The members of the Steering Committee of the Alabama Republican Executive Committee are hereby appointed and constituted as the Candidate Committee. . . . The Candidate Committee shall have and possess the following powers: (a) to review any declaration of candidacy, to determine if the candidate meets the qualifications prescribed in this resolution, and to direct the Chairman of the Alabama Republican Executive Committee not to certify a candidate which the Candidate Committee finds does not meet such qualifications; (b) to fill vacancies in any nomination for any public or party office with regard to the primary or other election and the general election where such vacancy exists by reason of death, resignation, disqualification, revocation or otherwise, and (c) to hear, consider, and decide and generally to have all the rights, duties, powers and authority of the Alabama Republican Executive Committee with regard to contests presented to said state committee under the provisions of Article 2 of Chapter 16, Title 17 of the 1975 Code of Alabama, as amended, including the right to prescribe appropriate rules governing any such contest; provided, however that such rules shall grant to the parties to any such contest their basic constitutional rights and privileges and shall not conflict with the provisions of said Article 2."
This resolution incorporated by reference the qualification form, which requires the candidate to certify that he or she is "a Republican and [is] in accord with, and endorse[s], the principles and policies of the Republican Party."
[2] McGinley also testified that an article in the MobilePress Register identified Barclay as the one who had submitted the complaint against her; the article, she said, detailed some of the reasons she was being considered for disqualification as a candidate. The Party does not dispute that such an article exists; however, that article is not in the record.
[3] For purposes of this appeal, the Party assumes, without admitting, that it was acting as a "state actor" when it disqualified McGinley. While state political parties have been held to be state actors in some contexts, see Terry v. Adams,345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), they may not be state actors in every context. As the Party notes in its brief, the status of the law on this point is not clear. See LaRouchev. Fowler, 152 F.3d 974 (D.C. Cir. 1998). As the United States Court of Appeals for the Eleventh Circuit stated in Wymbs v.Republican State Executive Committee of Florida, 719 F.2d 1072, 1077 (11th Cir. 1983):
 "In the earlier fifteenth amendment cases, involving white-only primaries or other disenfranchisement of blacks, the courts freely found the conduct of political parties and groups to constitute state action. But recently, courts have hesitated to find state action when, as in this case, racial discrimination is not involved. See Cousins v. Wigoda, 419 U.S. 477, 483, n. 4, 95 S.Ct. 541, 545, n. 4, 42 L.Ed.2d 595 (1975) (reserving the question); O'Brien v. Brown, 409 U.S. [1,] at 4 n. 1, 92 S.Ct. [2718,] at 2720 n. 1[, 34 L.Ed.2d 1] (1972) (not deciding and entertaining `grave doubts' as to actionability of the claim); Ripon Society, Inc. v. National Republican Party, 525 F.2d [567,] 574-76 [(D.C. Cir. 1975)] (reserving the question but deciding the merits for the defendants)."
(Footnote omitted.)
[4] Zeigler was not called to testify.
[5] According to the Party's rules, a decision of the candidate committee on this issue can be overturned by the state executive committee.
[6] "Rational basis" scrutiny, as opposed to any higher standard, is appropriate here because there is no evidence indicating that the Party's action infringed on a fundamental right of McGinley's — one has no fundamental right to run in the political primary of one's choosing — or that there is any kind of invidious discrimination against McGinley based on her status as a member of a suspect class. See LaRouche v. Fowler,152 F.3d 974, 995-97 (D.C. Cir. 1998).
[7] In addition to statutory discretion, we are also cognizant of the constitutional rights of political parties to assemble as they see fit. As the United States Court of Appeals for the Eleventh Circuit stated in Duke v. Cleland, 954 F.2d 1526, 1530-31 (11th Cir. 1992):
 "[T]he Republican Party enjoys a constitutionally protected freedom which includes the right to identify the people who constitute this association that was formed for the purpose of advancing shared beliefs and to limit the association to those people only. See Democratic Party of U.S. v. Wisconsin, 450 U.S. 107, 101 S.Ct. 1010, 1019, 67 L.Ed.2d 82
(1981). The necessary corollary to this is that Duke has no right to associate with the Republican Party if the Republican Party has identified Duke as ideologically outside the party. In cases where a voter has urged a right to vote in a party primary, the Supreme Court has stated that a `nonmember's desire to vote in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications.' Tashjian [v. Republican Party of Connecticut, 479 U.S. 208, 215 n. 6, 107 S.Ct. 544, 93 L.Ed.2d 514
(1986)]. The same rationale is also applicable in the instant case. Despite Duke's desire to be slated on the ballot as a Republican, we find that appellees did not infringe his right of association because the Republican Party legitimately exercised its right `to identify the people who constitute the association, and to limit the association to those people only.' Wisconsin, [450 U.S. at 121-23,] 101 S.Ct. at 1019.
". . . .
 ". . . The Supreme Court has long recognized that the First Amendment guarantees a political party's right of association and that this right `necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only.' Wisconsin, 450 U.S. at 122, 101 S.Ct. at 1019. In Eu [v. San Francisco County Democratic Central Committee, 489 U.S. 214, 224-26, 109 S.Ct. 1013, 103 L.Ed.2d 271
(1989)], in holding that a California statute that prohibited a political party from endorsing a primary candidate violated the party's constitutionally protected freedom of association, the Court stated that the party's freedom of association extends to the right to identify the people who constitute the association, and the right to select a standard bearer who best represents the party's ideologies and preferences."
Although explicitly not in the context of an election for public office, the United States District Court for the Northern District of Alabama also described this concern as follows:
 "[This case involves] plaintiff's right vel non to run for a position on the local governing board of the democratic party; and if such right exists, the extent to which conditions may be attached to the exercise of the right. Of necessity, the case raises the countervailing issue of first amendment free speech and associational rights of political parties.
 "In Wymbs v. Republican State Exec. Comm. of Fla., 719 F.2d 1072 (11th Cir. 1983) our circuit wrote:
 "`A political party and its members also "enjoy a constitutionally protected right of political association. . . . Moreover, `[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.'" Cousins, [v. Wigoda], 419 U.S. [477] at 487, 95 S.Ct. [541] at 547 [42 L.Ed.2d 595] (1975), quoting Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957).
 "` . . . [Democratic Party v. Wisconsin ex rel.] LaFollette [450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981)] instructs that,
 "`"[t]he freedom to associate for the `common advancement of political beliefs' necessarily presupposes the freedom to identify the people who constitute the association. . . ."
"`. . . .
 "`[A] State, or a court, may not constitutionally substitute its own judgment for that of the Party. A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution.'
 "450 U.S. at 122, 123-24, 101 S.Ct. at 1019-20
(citations omitted).
 "The same rationale applies to positions on the governing boards of political parties.
 "Based on Wymbs, this is the classic situation in which a federal court should stay its hand."
Thompson v. Woodall, 637 F.Supp. 944, 946-47 (N.D.Ala. 1986).
[8] The American Heritage Dictionary of the English Language
(4th ed. 2000) defines "tough love" as "[t]he use of strict disciplinary measures and limitations on freedoms or privileges, as by a parent or guardian, as a means of fostering responsibility and expressing care or concern."
[9] McGinley testified at the hearing in the trial court that she stood by everything in the article entitled "Righteousness or Republicanism" containing the reference to a third political party.
[10] In rendering its judgment, the trial court relied exclusively on Gartrell v. Knight, 546 F.Supp. 449 (N.D.Ala. 1982); however, its reliance on that case was misplaced. InGartrell, the United States District Court for the Northern District of Alabama held that the Alabama Democratic Party had violated the Due Process Clause of the Fourteenth Amendment by disqualifying a candidate, Gartrell, under the party's loyalty rule, called the "Radney Rule," by a voting process that was in clear violation of the party's own rules. However, the court also held that the "Radney Rule" itself violated Gartrell'ssubstantive due-process rights by not providing "adequate notice" of how he could comply with the rule. The Radney Rule provided:
 "`No person shall be permitted to qualify as a candidate for nomination or election to public or party office in said primary elections who did not support the nominees of the Democratic Party in the last general election.
 "`Any elected public official who attained office as a nominee of the Democratic Party, and any person who is a member of the State Democratic Executive Committee, shall not be permitted to qualify as a candidate for public or party office in said primary elections if, while holding such public or party office, he or she did not support the nominees of the Democratic Party in the last general election.'"
Gartrell, 546 F.Supp. at 451 (quoting Rules of the Democratic Party, Rule change adopted February 18, 1981). Gartrell was seeking to run as a Democrat, but had in the previous election run as a Republican.
 "Yet, the Democratic Party loyalty oath in force at the time Gartrell ran as a Republican permitted one who had supported another party to run in the subsequent election as a Democrat if `at least one year before the deadline for qualifying to run for nomination in said Primary Election (he) file(s) a written statement of his intention to so qualify with the Chairman of the State Executive Committee. . . .' Rules of the Democratic Party, Rules Changes and Additions Adopted April 21, 1979. This rule, superseded by the Radney Rule of February 14, 1981, required notification to the party at least one year before the deadline for qualifying, but was repealed approximately one year and five months before that deadline. If the 1979 rule had not been repealed, Gartrell could have complied with it and sought office in the 1982 election as a Democrat. Under the Radney Rule, the test for loyalty is not prospective but retrospective and prejudicial."
546 F.Supp. at 454.
The differences between the case at hand and Gartrell are clear. Most importantly, unlike in Gartrell, the case at hand presents absolutely no retroactive application of a rule that extinguishes preexisting rights.
Gartrell itself holds that "parties may require loyalty of voters or candidates." 546 F.Supp. at 454. It blinks reality to say that a would-be candidate needs written guidelines establishing in advance a schedule of permissible activities in order to determine whether her outspoken support of another political party in the months preceding her candidacy would expose her to the risk of a challenge to, and ultimately the rejection of, the sincerity of her pledge of loyalty.