MOORE, Judge.
Jim Harris appeals from a summary judgment entered by the Jefferson Circuit Court (“the trial court”) on his claims aris- *161 mg from the demolition of his house by the City of Birmingham (“the City”).

Facts and Procedural History

On November 30, 2009, Harris filed in the trial court a complaint against the City and several fictitiously named defendants, alleging, among other things, that the City had. been negligent in connection with its demolition of a house owned by Harris (“the house”) that was located within the jurisdiction of the City. He requested that the trial court issue a judgment declaring that the City had violated his due-process rights in connection with the demolition of the house. On December 22, 2009, the City filed its answer to Harris’s complaint, as well as a counterclaim alleging abuse of process in connection with Harris’s filing of his complaint. The City filed an amended answer and an amended counterclaim on January 5, 2010. On January 29, 2010, Harris answered the City’s counterclaim, as amended.
On November 16, 2010, the City filed a motion for a summary judgment. In support of its motion, the City filed, among other things, an affidavit of Curtis Fag-gard, the chief of condemnation for the City’s Department of Planning, Engineering, and Permits. Faggard stated in his affidavit:
“I am the Chief of Condemnation for the City of Birmingham Department of Planning, Engineering, and Permits. I have been the Chief of Condemnation for 2½ years. Prior to that, I was an Inspector for 12½ years for the City of Birmingham Department of Planning, Engineering, and Permits. My responsibilities are to coordinate, determine and advise on the demolition of properties located within the City of Birmingham. I have reviewed the condemnation files and am familiar with the property
“The City has been dealing with Mr. Harris concerning the state of his property for about eleven (11) years. Mr. Harris purchased the property on February 19, 1999. On April 16, 1999, Mr. Harris applied for a condemnation repair permit. He was granted a condemnation repair permit.
“On July 3, 2001, after an inspection by the City’s inspectors, the City’s Department of Planning, Engineering and Permits forwarded Mr. Harris a certified letter to his address [in] Ensley. Linda Harris signed for the letter. The letter informed Mr. Harris that the property ... was in a dangerous state of disrepair and a public nuisance. The letter further informed Mr. Harris that the condemnation repair permit was voided on June 29, 2001 due to the fact that repairs had not been made to the property and that the condemnation process [was] being reinstated. The property was placed back on the condemnation process list.
“On September 4, 2002, the City forwarded ... a certified letter to Mr. Harris .... The letter was signed [for] by Mr. Larry Johnson. The letter informed Mr. Harris that the property ... was in a dangerous state of disrepair, unsafe and a public nuisance. The letter further ... informed Mr. Harris that the property would be demolished in thirty (30) days.
“On October 2, 2002, Mr. Harris came to the City’s condemnation office and requested another condemnation repair permit. The condemnation repair permit was issued. The City continued to monitor the ... property. However, again, over time, Mr. Harris did not make any repairs to the property.
“On June 18, 2009, the City wrote and forwarded [Harris] a certified letter .... It was signed [for] by Lenorn Gil *162 christ. The letter informed Mr. Harris that the property was in a dangerous condition, unsafe and constituted a public nuisance. The letter further informed Mr. Harris to get a permit by July 21, 2009[,] or his property would be subject to condemnation and demolition consideration by the Birmingham City Council. All demolitions are approved by a vote by the Birmingham City Council. Mr. Harris did not acknowledge the certified letter or come to City Hall.
“On July 21, 2009, the Birmingham City Council considered the condemnation and demolition of the ... property. The matter was agenda item # 50. The agenda item was called up for consideration and debated. Mr. Harris was not present. Seeing no objections, the City Council voted and ordered that [the] property be condemned and demolished.
“On July 21, 2009, I forwarded [Harris] a certified letter to his residence [in] Ensley. It was signed [for] by Mr. Harris. The letter informed Mr. Harris that the Birmingham City Council on July 21, 2009 had voted on the condemnation o[f] his property and ordered the Director of Planning, Engineering and Permits to take bids to demolish [the] property. The letter also informed him that all property would be removed by the contractor demolishing the property if not removed within fifteen (15) days. Mr. Harris did not acknowledge the certified letter or come to City Hall.
“On or after October 4, 2009, following the mandate by the Birmingham City Council, the City’s Public Works Department went to the ... property ... capped the sewer and then demolished the property. The property was vacant and uninhabitable. The property was demolished pursuant to the City’s condemnation process.”
On December 15, 2010, Harris responded to the City’s summary-judgment motion. He attached to his response his affidavit in which he detailed the repairs that he had made to the house and stated that all necessary repairs had been made by early 2006. Harris further stated:
“A few weeks before the house was demolished, I called Mr. Curtis Faggard on the telephone; it is my understanding that Mr. Faggard is a) an employee of the City of Birmingham; b) is ‘in charge’ of the demolition effort by the City of Birmingham, and; c) was so acting during my conversation with him. The reason for the noted conversation was that I had received an earlier call from my sister Linda Harris, who told me that she had seen a demolition notice on the property from the City of Birmingham and that I needed to call Mr. Faggard. I wish to point out that I never received the notice of July 21, 2009 which contains my name on the receipt card, but which I never signed for. A cursory examination of the receipt card for the July 21st notice shows: a) that the name ‘Jim Harris’ thereon could not reasonably be called a signature, and; b) it bears absolutely no resemblance to any of the numerous examples of my signature appearing on documents that the City of Birmingham uses in support of the Motion for Summary Judgment. It does however bear a striking resemblance to the ‘signature’ of Larry Johnson on the receipt card for the notice dated September 4, 2002; I am not Larry Johnson.
“Again, as a result of my sister phoning me I called Mr. Faggard and informed him of the completed renovations/repairs made on, and to the house. During our conversation Faggard seemed satisfied with my efforts relative to the house, and he told me to paint the exterior (so that the house would not *163 look like it was abandoned) and it would not be demolished. Again, it was my understanding that Mr. Faggard was the City employee ‘in charge’ of the demolition effort by the City of Birmingham, and was so acting during my conversation with him. Also, it was my understanding, based upon Faggard’s statements during our conversations that he had the authority to enter into an agreement or give me assurances (on behalf of the City of Birmingham) regarding postponing or setting aside any demolition of a home. I recall asking Faggard if there was something that he could do to stop the demolition, and he said ‘yes.’ It was, at this point, that he instructed me to paint the exterior of the house. In my opinion, my reliance upon Faggard’s representations that if I had the exterior of the house painted it would not be demolished was, based upon[] the circumstances, both reasonable and justified.
“In reliance on Mr. Faggard’s representation, I had the exterior of the house painted prior to the day of demolition. I had no reasons to think or believe that my home, in light of Faggard’s representation, would be slated for demolition. Alternatively stated, I thought that I had an agreement with the City of Birmingham, via Mr. Faggard’s representations and authority, and that because I had lived up to my end of the agreement my home would not be slated for demolition.
“On the date of the demolition, I was notified, in person, by a neighbor, Ms. Veronica Fields, who informed me that earlier in the day the City of Birmingham’s demolition crew: a) had come the house; and b) kicked my front door in. I thereupon went to the house. Upon arriving, the demolition crew was not present, but I immediately noticed that (1) my aluminum storm door at the front of the house had been carefully removed from its hinges and set away from the entry door, and (2) my HVAC air conditioning compressor unit that I had placed in the living room of the house was missing. As I proceeded to the rear of the house, I found the rear door open, and my HVAC furnace laying outside in the back yard next to a large mound of dirt that had been gouged out of the ground. Upon seeing all of this, I ran back to [the address at which I reside] and attempted to call the City of Birmingham to get an explanation as to why my home was going to be demolished. However, I was unable to reach any City of Birmingham officials. Then Ms. Fields reminded me that, it being a weekend, the City offices were closed. I then went back to the ... property and waited for the demolition crew to return. When they returned, I asked the foreman to explain to me why he kicked in the door of my house and who authorized the demolition of my house. After he attempted to explain his understanding of his orders, I asked him to go inside [the] house with me to observe the interior himself and satisfy himself that it was in livable, move-in ready condition. He, also at my request, got on his walkie-talkie and called his supervisor and explained what he had observed. I had previously told the foreman that I had an agreement with Mr. Faggard regarding holding off on demolition, and that there was apparently a misunderstanding/miscommunication regarding demolition. The crew foreman relayed what I had told him, and what he saw relative to the good condition of the interior of the home, to his supervisor. I overheard the superior tell the foremen that if I could not produce the proper permit, to proceed with the demolition, irrespective of: a) the good *164 condition of the house, and; b) any agreement that I did or did not have, with Faggard. Based upon the circumstances the crew foreman, and his supervisor, were Birmingham employees, acting as such, on the date of the demolition.
“At this point I pleaded with the foreman to try to get his superiors to wait until the next business day when I could talk to Mr. Faggard, or some other appropriate official, and straighten out the question of demolition. However, upon receiving his instructions from his superior, he proceeded to demolish the house — the house I had put so much money, time and effort into — with me standing there, helplessly watching. I was so aghast and in shock that this was actually happening, that I did not think to even go into the house to retrieve the records and receipts nor anything else. In my opinion, in no way was the house in a condition that justified condemnation or demolition. In my opinion, the demolition of my house was a breach of the agreement that I had with the City of Birmingham via Mr. Faggard, regarding demolition of my house.
“I never received the notice that was apparently signed for by Lenorn [Gilchrist]. Mr. [Gilchrist] is mentally ill and did not give me any document that he signed for. The photo sets included by the City of Birmingham in support of its Motion for Summary Judgment contain no substantial interior, or exterior views of the house: a) after I purchased it, or; b) after I had begun and/or completed work on it.”
Harris also included a supporting affidavit from Veronica Fields in which she stated that the house was not a nuisance. On December 17, 2010, the City filed a reply to Harris’s response. Harris then filed a supplemental response and attached an affidavit executed by Harris’s sister, Linda Harris, in which she stated:
“Some weeks before the actual demolition, I saw a notice posted on the house. Though I do not recall the exact words and did not save it, my best recollection is that it did reference the City Council and said the house was condemned. I informed my brother about the notice. I had been in the habit of looking in on the property three of four times a week for a number of years, since my brother lived out of town and came to work on the house on the weekends. I had never before seen such a notice on the house and did not see a subsequent one prior to the demolition.”
The trial court entered a summary judgment in favor of the City and certified that judgment as final, pursuant to Rule 54(b), Ala. R. Civ. P.[1] The trial court subsequently dismissed the City’s counterclaim. On February 17, 2011, Harris filed a motion to alter, amend, or vacate the trial court’s judgment; that motion was denied on March 7, 2011. On April 14, 2011, Harris appealed to the Alabama Supreme Court; that court transferred the case to this *165 court, pursuant to § 12-2-7(6), Ala.Code 1975.

Standard of Review

“‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo. Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).

Discussion

Harris raises several issues on appeal. We first address his arguments relating to the propriety of the demolition order.
Section 11-40-30, Ala.Code 1975, authorizes municipalities to demolish a building when the local governing body finds the building to be an unsafe public nuisance. Before demolishing a building, a municipality must comply with the notice provision in § 11-40-31, Ala.Code 1975, which provides, in pertinent part:
“Whenever the appropriate municipal official of the municipality finds that any building, structure, part of building or structure, party wall, or foundation situated in the municipality is unsafe to the extent that it is a public nuisance, the official shall give the person or persons, firm, association, or corporation last assessing the property for state taxes and all mortgagees of record, by certified or registered mail to the address on file in the tax collector’s or revenue commissioner’s office, notice to remedy the unsafe or dangerous condition of the building or structure, or to demolish the same, within a reasonable time set out in the notice, which time shall not be less than 30 days or suffer the building or structure to be demolished by the municipality and the cost thereof assessed against the property. The mailing of the certified or registered mail notice, properly addressed and postage prepaid, shall constitute notice as required herein. Notice of the order, or a copy thereof, shall, within three days of the date of mailing, also be posted at or within three feet of an entrance to the building or structure. If there is no entrance, the notice may be posted at any location on the building or structure.”
Following proper notice, any party having an interest in the building to be demolished may petition the local governing body for a hearing, stating any objections that party may have to the finding that the building is an unsafe public nuisance. § ll-40-32(a), Ala.Code 1975. If the local governing body maintains its position that the building is an unsafe public nuisance *166 and should be demolished, the aggrieved party may file an appeal in the appropriate circuit court within 10 days of that determination. § ll-40-32(b), Ala.Code 1975.
The record shows that the city council of the City determined at a meeting conducted on July 21, 2009, that the house was an unsafe public nuisance and that it should be demolished. According to Faggard’s affidavit, his office sent Harris a certified letter on June 18, 2009, to inform him of the July 21, 2009, city council meeting, so that he would have an opportunity to be heard on the issue.[2] When Harris did not attend the meeting, the city council determined that no one objected to the house being declared an unsafe public nuisance and it issued a demolition order.
Harris argues generally that the city council erred in determining that the house was an unsafe public nuisance. However, § 11-40-32 provides the procedure to challenge a finding that a building constitutes a public nuisance; as outlined above, that procedure includes the right to appeal the determination of the governing body of the municipality to the circuit court. In Brown v. City of Mobile, 578 So.2d 1251 (Ala.1991), our supreme court held that a “challenge [to] the city council’s finding that the house should be demolished” could not be brought in a collateral action but, instead, was “reserved for ... the appeal process” provided by statute, which, in this case, is § 11-40-32. 578 So.2d at 1253. Similarly, in the present case, Harris’s arguments challenging the City’s finding that the house was an unsafe public nuisance should have been made in an appeal to the circuit court from the City’s decision and cannot be considered on this appeal.
Harris next argues that the notice provisions set out in § 11-40-31 are unconstitutional because they do not assure that the owner of a building scheduled for demolition will receive timely personal service of the demolition order. We construe that argument as a facial attack on the constitutionality of the statute. See State v. Adams, [Ms. CR-08-1728, Nov. 5, 2010] — So.3d -, - (Ala.Crim.App.2010) (“To prevail on a facial challenge to the constitutionality of a statute, it must be established ‘that no set of circumstances exists under which the [statute] would be valid.’ ” (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987))). A court has jurisdiction to consider a facial constitutional challenge to a statute only if the challenging party has served notice of the challenge on the state’s attorney general, pursuant to § 6-6-227, Ala.Code 1975.
“Ala[bama] Code 1975, § 6-6-227, requires that, in any proceeding in which a ‘statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney General of the State shall also be served with a copy of the proceeding and be entitled to be heard.’ ... When a party seeks a declaration of rights regarding the validity of a statute, ‘service on the Attorney General, pursuant to § 6-6-227, is mandatory and jurisdictional.’ Barger v. Barger, 410 So.2d 17, 19 (Ala.1982). Although § 6-6-227 is found within the Declaratory Judgment Act, when the constitutionality of a statute is challenged, service on the attorney general is required regardless of whether the action was in the nature of a declaratory judgment action. Wallace v. State, 507 So.2d 466 (Ala.1987).
“If the party challenging the constitutionality of a statute fails to serve the *167 attorney general, as required by Ala. Code 1975, § 6-6-227, the trial court has no jurisdiction to decide the constitutional claims. Guy v. Southwest Alabama Council on Alcoholism, 475 So.2d 1190 (Ala.Civ.App.1985). Furthermore, our Supreme Court has held ‘that failure to serve the attorney general “goes to the jurisdiction of the court,” that the “absence of jurisdiction is apparent on the face of the record,” and that we must take notice of our own want of jurisdiction’ and dismiss the appeal. Smith v. Lancaster, 267 Ala. 366, 367, 102 So.2d 1, 2 (Ala.1958) (citations omitted).”
Tucker v. Personnel Bd. of Dothan, 644 So.2d 8, 9 (Ala.Civ.App.1994). Accordingly, we dismiss the appeal to the extent that Harris challenges the constitutionality of § 11-40-31.
Harris further argues that a genuine issue of material fact exists as to whether the City complied with the notice requirements in § 11-40-31. Faggard’s affidavit establishes that he personally sent a certified letter to Harris notifying him of the demolition order.[3] Harris asserts, however, that the City did not establish in its summary-judgment motion that it had posted the required notice on the house itself as required by the last two sentences in § 11-40-31. We note that the City generally asserted in its summary-judgment motion that it had met all the legal requirements for demolition of the house, and the record contains a photograph of the notice affixed to the house. Moreover, Harris addressed the issue whether the City properly posted the notice in his response to the summary-judgment motion. Thus, it was incumbent upon Harris to introduce substantial evidence indicating that the City had not complied with the posting of the notice requirement. Pritchett, supra. Harris contends that the affidavit testimony of Linda Harris presents a genuine issue of material fact as to whether the City properly posted the notice. However, the record shows that the demolition occurred “on or after” October 4, 2009. Linda Harris attested only that she saw the notice posted on the house “some weeks” before the demolition; she did not testify that the notice was not posted on the house within three days of the mailing of the July 18, 2009, letter, as required by § 11-40-31. We therefore conclude that, because of the imprecise nature of Linda Harris’s assertions, it cannot be considered substantial evidence indicating that the City did not post the required notice at the required time.
Harris also argues that, even if the City fully complied with § 11-40-30 et seq., the City nevertheless negligently proceeded with the demolition because, he says, Fag-gard had agreed to forgo demolition if Harris painted the house, which Harris did.[4] The City counters that a property *168 owner can avoid demolition of an unsafe public nuisance only by obtaining a repair permit and promptly remedying the defects rendering the building an unsafe public nuisance, see § 11-40-31, or by appealing the demolition order through the process provided in § ll-40-S2(b). According to the City, a municipal employee cannot enter into an informal agreement that, if a property owner remedies certain defects in a building, the municipality will not execute a valid, existing demolition order. Based on the general rule that a governing body cannot be estopped by the invalid or unauthorized acts or statements of its employees, see Ex parte Ballew, 771 So.2d 1040 (Ala.2000), and Perkins v. Shelby County, 985 So.2d 952 (Ala.Civ.App.2007), the City argues that it could not have been negligent in failing to carry out Faggard’s agreement.
In his brief to this court, Harris does not dispute the basic principle that a municipality generally cannot be estopped by the invalid or unauthorized acts or statements of its employees. Harris further does not dispute that his agreement with Faggard does not comply with §§ 11-40-31 or 11-40-32. Instead, Harris maintains that the estoppel doctrine does not apply to his case. Harris maintains that he is not attempting to avoid the demolition order based on the defense of equitable estoppel but, rather, is claiming that Faggard acted negligently in making the unauthorized agreement and in failing to assure its performance, resulting in the house being demolished. However the claim is couched, it remains that Harris cannot recover on his claim unless the City acted unreasonably in demolishing the house despite the unauthorized agreement. Harris has not cited any specific legal authority to support his position that a municipality would be negligent in following a demolition order under these circumstances. See Rule 28, Ala. R.App. P. “Authority supporting only ‘general propositions of law1 does not constitute a sufficient argument for reversal.” Beachcroft Props., LLP v. City of Alabaster, 901 So.2d 703, 708 (Ala.2004) (quoting Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App.1997)).
Harris next argues that there is a genuine issue of material fact as to whether the unnamed supervisor, who was contacted on the day of the demolition, was negligent in not halting the demolition once the demolition-crew foreman inspected the house and found it to be in a habitable condition. Harris also argues that the City was negligent by requesting that the city council condemn the property. We note, however, that both of those arguments are tantamount to challenging the city council’s conclusion that the property was an unsafe public nuisance that should be demolished. As set out above, those claims cannot be raised in this collateral proceeding.

Conclusion

Based on the foregoing, we dismiss the appeal to the extent that Harris challenges the constitutionality of § 11 — 40—31. We affirm the judgment in all other respects.
APPEAL DISMISSED IN PART; JUDGMENT AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. On January 14, 2011, the trial court entered an order entitled "Order Granting Defendant City of Birmingham's Motion for Summary Judgment.” (Emphasis added.) At the conclusion of the order, however, the trial court stated: "For the preceding reasons, it is hereby ORDERED, ADJUDGED and DECREED, that summary judgment is hereby DENIED.” (Capitalization in original.) The trial court certified the judgment as final, pursuant to Rule 54(b), Ala. R. Civ. P. On January 18, 2011, the trial court amended the January 14, 2011, order by stating: "For the preceding reasons, it is hereby ORDERED, ADJUDGED and DECREED, that summary judgment is hereby GRANTED/' (Capitalization in original.) On January 19, 2011, the trial court entered an order dismissing the City’s counterclaim.

. Harris does not argue that he did not receive the letter or that his due-process rights were violated because Lenorn Gilchrist signed for the certified mail.

. Harris disputes that he received that certified letter, maintaining that the signature on the receipt card was forged. However, §11-40-31 provides that ‘‘[t]he mailing of the certified or registered mail notice, properly addressed and postage prepaid, shall constitute notice as required herein.” Moreover, Harris does not argue in his brief to this court that the City did not provide him due process on the basis that he never actually received the certified letter. "When an appellant fails to properly argue an issue, that issue is waived and will not be considered. Boshell v. Keith, 418 So.2d 89 (Ala.1982).” Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App.1996).

. For the purposes of the summary-judgment motion, we must assume that Faggard made the agreement with Harris and that Harris performed all of his obligations pursuant to that agreement because Harris presented substantial evidence supporting those facts. See Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).